**AMERICAN ELECTRONIC LABORATORIES, INC.,**
**Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 85–780.**

United States Court of Appeals, Federal Circuit.

Oct. 7, 1985.

Raymond S.E. Pushkar, McKenna, Conner & Cuneo, Washington, D.C., argued for appellant. With him on the brief were Lawrence M. Farrell and Michael T. Janik, Washington, D.C.

Richard W. Oehler, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Washington, D.C.

Levator Norsworthy, Lt. Col. JAGC, Dept. of the Army, Washington, D.C., of counsel.

Before NEWMAN, Circuit Judge, COWEN, Senior Circuit Judge, and BISSELL, Circuit Judge.

BISSELL, Circuit Judge.

American Electronic Laboratories (AEL) appeals from the decision of the Armed Services Board of Contract Appeals (Board), which affirmed the contracting officer's denial of AEL's claim. For the reasons set forth below, we reverse the Board's decision and remand the case for proceedings consistent with this opinion.

## BACKGROUND

Since a full and complete statement of facts relevant to this case is contained in the Board's decision reported at 84–2 BCA ¶ 17,468 (ASBCA 1984), only a summary of the facts is presented here. Reference to the Board's findings of fact will be cited by their paragraph number as "FF ___."

On October 13, 1978, AEL was awarded Contract No. DAAD07–79–C–0017 by the U.S. Army White Sands Missile Range (WSMR) to produce several electronic countermeasure test simulators. The simulators were to be used to determine the vulnerability of the Patriot missile to jamming equipment, before that missile went into production. WSMR worked through the Office of Missile Electronic Warfare (OMEW) in procuring the simulators.

Because the nature of the work involved advanced research and development of technical uncertainties, WMSR justified resort to a cost-plus-fixed-fee contract. The contract included the Limitation of Funds (LOF) clause which provided that (1) AEL was required to notify the contracting officer (CO) in writing when AEL had reason to believe that the costs that it would incur in the next sixty days, when added to all previously incurred costs, would exceed seventy-five percent of the funds then allotted to the contract; (2) absent written notice from the CO increasing the alloted amount, the government was not liable for costs incurred by AEL in excess of the total amount allotted to the contract; and (3) absent the CO's written notice, AEL was not obligated to continue performance under the contract or otherwise to incur costs in excess of the amount allotted to the contract.

The contract further required that a monthly status report be sent to the CO and it also set forth the authority for the CO's technical representatives who acted in a liaison capacity between AEL and the CO.

Eight months into the contract (early June 1979) AEL started experiencing a cost growth which was due in large part to a subcontractor's performance problems. The technical representatives conferred with AEL on the problem, and it was mutually decided that a work around program coupled with engineering changes could compensate for the subcontractor's poor performance. However, these steps did not resolve the problem and the subcontractor was terminated. As a result of these events, AEL anticipated a cost overrun and informed the technical representatives by June 27 that an estimate would be forthcoming. On August 21 AEL notified the CO of its anticipated cost growth and requested $1,124,200.

Thereafter the technical representatives met with AEL on several occasions to discuss the cost overrun and the additional

funding which was needed to complete the contract. At a meeting on September 25 and 26, 1979, AEL indicated its cost growth was then $1,396,524. The technical representatives advised AEL that the government had only an additional $900,000 available for the contract. Prior to this two day meeting the contract limit was $3,418,487. As a result of the meeting, the Board found, AEL knew the contract limit was $4,318,487 if no additional funding was available to WSMR. On October 12, AEL notified the contract specialist that it had exceeded its present funding, requested preliminary funding of $500,000, and indicated it was continuing performance of the contract. On October 17, AEL informed WSMR that it would be at WSMR on October 23 to negotiate and finalize the funding issue. On October 19, the CO responded to a memorandum which detailed the strategy which the government was to use in negotiating with AEL on October 23. The memorandum advised that it was not in the best interests of the government for work to stop, stated that "every effort must be made to fund this contract and thus continue performance," and recommended a contract modification of $900,000. The CO determined that the proposed modification would be in the best interests of the government and signed a document authorizing the modification. At the October 23 meeting, AEL and WSMR reached an agreement on changes totaling $125,638. AEL was unable to negotiate for any greater sum because its negotiating team lacked engineers who could quantify the reduction in contract scope which was proposed by the government. On November 21, 1979, the CO signed a modification of the contract which added the $125,638 to the contract. On December 11, AEL informed the government that it would cease work on December 15 unless an additional $500,000 was added to the contract by December 14. The CO responded by requesting that AEL extend its deadline until December 21, to allow more time to secure funding. On December 20, the CO informed AEL that the funds still were not available and might not be prior to January 2, 1980. AEL ceased work on December 21, 1979. On January 8, 1980, the CO informed AEL that no additional funding had been received, whereupon, AEL asked the CO to release the residue of the $900,000. After the CO informed AEL that *no* funds were available, AEL submitted a claim for $1,361,644 which the CO denied. AEL then appealed to the Board.

■ In its decision on AEL's appeal, the Board denied AEL's claim for costs incurred in excess of the funds allotted to the contract. The Board determined that AEL had failed to provide timely notice of the cost overrun and that the government was not estopped from invoking the LOF clause. AEL brings this appeal before us pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613. Under our scope of review the Board's conclusions of law are not final and are thus freely reviewable, while the Board's findings of fact are final and our review is limited to a determination whether those findings are arbitrary, capricious, based on less than substantial evidence, or rendered in bad faith. 41 U.S.C. § 609(b) (1982).

### ISSUES

(1) Whether the Board correctly determined that AEL failed to give timely notice.

(2) Whether the Board correctly determined that the government was not estopped from invoking the LOF clause.

### ANALYSIS

#### I Notice

■ The Board held that AEL should have given notice not later than early June 1979 and found that AEL did not actually give notice until late July. AEL argues that the Board erred in holding that it failed to give timely notice. After reviewing the record we are persuaded that the Board's factual finding on this issue is supported by substantial evidence and we are not persuaded that its legal conclusion is erroneous as a matter of law.

■ Alternatively, AEL argues that the government waived this condition of notice. We choose not to address the question because it is not dispositive. One of our predecessor courts observed that it is within the discretionary authority of the contracting officer to fund an overrun even in the absence of timely notice. *General Electric Co. v. United States,* 412 F.2d 1215, 1220, 188 Ct.Cl. 620 (1969). There is no dispute that AEL actually provided notice of the overrun and that the content of its notice satisfied the contractual requirements. Under these circumstances, if the CO decided to fund the overrun after receiving such notice (as we hold here the CO is estopped from denying), then the timeliness of the contractor's notice is beside the point.

## II Estoppel

Paragraph (d) of the LOF provides that: the Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the total amount from time to time allotted to the contract ... unless and until the Contracting Officer has notified the Contractor in writing that such alloted amount has been increased and has specified in such notice an increased amount constituting the total amount then allotted to the contract.... No notice, communication or representation in any other form or from any person other than the Contracting Officer shall affect the amount alloted to this contract.

On the basis of that provision the government denied AEL's $1,361,664 overrun claim. On appeal to the Board, AEL asserted that the government by its conduct was estopped from relying on the LOF provision. The Board held that the government was not estopped, basing its decision on *Hughes Aircraft Corporation,* 83–1 BCA ¶ 16,396 (ASBCA 1983). On appeal to this court AEL argues that the Board erred in holding that the facts in this case failed to establish an estoppel.

One of our predecessor courts has observed that "[t]he Government in certain situations may be estopped from denying actions relied on by others to their detriment, where such action is within the scope of its agent's authority.... The necessary elements to establish an estoppel are set out in *Emeco Industries, Inc. v. United States,* 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973)." *Breed Corporation v. United States,* 27 CCF ¶ 80,333 at 85,453 (Ct.Cl.Tr. Div.1978), *adopted per curiam,* 650 F.2d 286, 223 Ct.Cl. 702 (1980) (adopting the trial judge's recommended decision with one modification not relevant here).

■ Four elements must be present to establish an estoppel: (1) the party to be estopped must know the facts, *i.e.,* the government must know of the overrun; (2) the government must intend that the conduct alleged to have induced continued performance will be acted on, or the contractor must have a right to believe the conduct in question was intended to induce continued performance; (3) the contractor must not be aware of the true facts, *i.e.,* that no implied funding of the overrun was intended; and (4) the contractor must rely on the government's conduct to its detriment. *Hughes Aircraft Corporation,* 83–1 BCA at 81,516; *see United States v. Georgia-Pacific Co.,* 421 F.2d 92, 96 (9th Cir.1970), *Emeco Industries, Inc. v. United States,* 485 F.2d 652, 657, 202 Ct.Cl. 1006 (1973).

■ Neither party disputes the Board's express findings of fact. We have thoroughly reviewed the record and conclude that those express findings are supported by substantial evidence. The Board concluded its fact finding in this manner:

From this recitation of facts, the Board finds that it is clear that from early June 1979 through January 1980 the Government in the person of the [technical representative] and the contracting officers (Ms. Boman and Mr. Acosta) knew that AEL had experienced a cost growth; that by July, the cost growth was believed by AEL to be above the then contract limit of $3,418,487. In the month subsequent to July, the cost growth ballooned or was explained in letters, re-

ports and in conferences where the parties explained their positions. In the seven month period, the Government also knew that AEL continued to perform the contract. In this period, the contracting officer never discouraged AEL from performing and never gave the contractor any written response to the actual notice that a cost overrun had taken place.

It is also evident that in the period June through December the contractor knew or should have know that the cost incurred was such that as early as the first weeks of June a cost overrun was an imminent probability. Nevertheless, the appellant never considered stopping performance as was its right under the contract until some six months had passed. It is also evident that both appellant and WSMR wished that the contract could be performed, but from our findings there is no evidence that WSMR indicated to appellant that additional funds were likely to be allotted to the contract above and beyond the $900,000 disclosed to AEL.

84–2 BCA at 87,035.

Thereupon, the Board quoted extensively from *Hughes* and concluded: "We can find no reason not to express the same sentiments as regards the Limitation of Funds clause. The briefs of the parties do not suggest that different treatment is required. The appeal is denied." 84–2 BCA at 87,037. Obviously the Board failed to articulate with any specificity why it believed the facts of this case did not satisfy the four element test to establish an estoppel.

Applying the *Hughes-Emeco* test to the facts of this case there is no question that the first and third elements are satisfied. With regard to the first element, the Board found and the government does not dispute that the CO knew of the overrun. FF 36. With regard to the third element, the Board found that it was not until December 20 that AEL was aware for the first time that additional funds *might not* ever be available. FF 71.

With regard to the fourth element, the Board found that AEL continued performance and was operating on its own funds. FF 51, 52. Although operating in this fashion was to AEL's detriment, the government argues that it was not in reliance on the government's conduct because AEL's action preceded any authorization by the CO. The Board did not base its decision on this reasoning and we are not persuaded by it. The clear import of the Board's findings is that AEL continued its performance because of the government's conduct. In its brief the government asserts that the Board found "there is *no evidence* that the agency ever indicated to AEL that additional funds would be forthcoming." Respondent's Brief at 19 (emphasis in original). That assertion overstates the record; actually the Board found there was no evidence of an indication to AEL "that additional funds were likely to be allotted to the contract above and beyond the $900,000 disclosed to AEL." 84–2 BCA at 87,035. The necessary implication is that the government did in fact indicate that $900,000 would be forthcoming. FF 49.

As we view the matter, the crux of this case is the second element, that is, whether the government intended that its conduct be acted on, or whether it acted in such a manner that AEL could reasonably believe that the government so intended. Phrased another way the second element is a question of expectation:

> [T]he promisor must have had reason to expect the reliance that occurred.... The standard for testing expectation is an objective one, under which the promisor is bound if he had reason to expect reliance, even if he did not in fact expect it.[34] This is a question of fact to be determined on the basis of the circumstances of each case.

[34] Presumably the promisor is bound in the unlikely situation in which he actually expected the reliance, even though he had no reason to expect it.

E. Farnsworth, *Contracts* § 2–19 at 90 (1982). Although this commentator was referring to promissory estoppel, one of

our predecessor courts has labeled the four element test a test for equitable estoppel. Notwithstanding the labels, we regard the analysis of expectation applicable to the analysis of intent—the second element of our four element test.

In preparation for the October 23 meeting, a memorandum was prepared by the contract specialist (who was soon to be the CO) and given to the CO on October 19. This memorandum detailed the strategy which was to be used by the government during that meeting with AEL. The Board found that the aim of the government was to negotiate a contract amendment of $900,000. FF 53. The record reveals that the advice of a technical representative was that "it is not in the best interests of the Government for work to stop under the contract and every effort must be made to fund the contract and thus continue performance," and that the contract specialist expected that negotiations would result in a $900,000 increase to the contract. Joint Appendix at 86, 88. Based on this information the CO determined that a modification to the contract was in the best interests of the government. FF 54. In making this determination the CO wrote that "the contractor advises that contract funding has been exceed[ed] and additional funding must be made available in order for the contractor to continue its efforts"; the CO then signed the document which authorized the $900,000 modification. Joint Appendix at 85. As a result of the October 23 meeting the Board expressly found that the government *expected* AEL's continued performance. FF 56. [Emphasis added.]

The Board extensively quoted *Hughes*, apparently for the proposition that AEL's reliance was unreasonable. In its brief the government argues that AEL had no reasonable basis to believe that additional funds were or would become available and that the Board regarded this case as on all fours with *Hughes*. In its opinion the Board in this case stated that it could find "no reason not to express the same sentiments as regards the Limitation of Funds clause" as *Hughes* expressed. 84–2 BCA at 87,037. We, on the contrary, can see a sufficient reason.

The Board in *Hughes* observed that "the most serious defect" with the contractor's estoppel theory was "its failure to prove that it reasonably interpreted and relied on any Government conduct." 83–1 BCA at 81,518. The Board noted that "the contractor was advised repeatedly that the Government was having serious difficulties in finding reprogrammable funds," that "the contracting officer warned [the contractor's] personnel 'over and over again' that the probability of adding further funds to the contract was not good," and that "[f]ar from being encouraging, the official warnings ... were distinctly negative and discouraging." *Id.* at 85,519.

None of those factual circumstances is present in this case. Indeed, the contractor was reassured repeatedly that the government had $900,000 easily available, FF 49, 62; in the seven month period from June 1979 to January 1980 "the contracting officer never discouraged AEL from performing," 84–2 BCA at 87,035; and far from being negative and discouraging the government representations were so distinctly encouraging with regard to the $900,000 that it was not until December 20 that AEL became aware for the first time that additional funds might not ever be available. FF 71. From the time that the government first learned of the impending overrun until the time that AEL finally stopped work, government representatives, including the CO, consistently induced AEL to continue its performance by making representations that the government would fund the overrun.

The government's contention and the Board's apparent finding that AEL's reliance upon the technical representatives at the October 23 meeting was unreasonable must be evaluated in light of *Max Drill, Inc. v. United States*, 427 F.2d 1233, 1243, 192 Ct.Cl. 608 (1970):

The statements of the Technical Representative cannot be completely disavowed and repudiated on the ground that he was without authority to speak for

the contracting officer. *General Casualty Co.*, [127 F.Supp. 805, 130 Ct.Cl. 520 *cert. denied*, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955)]. When an official of the contracting agency is not the contracting officer, but has been sent by the contracting officer for the express purpose of giving guidance in connection with the contract, the contractor is justified in relying on his representations. *Fox Valley Eng'r, Inc. v. United States*, 151 Ct.Cl. 228, 240 (1960).

Although the contract in *Max Drill* was awarded in 1965 and the court was not construing an LOF clause, the case nevertheless bears on the reasonableness of AEL's reliance. The conduct of the technical representatives in AEL was more like that of the technical representative in *Max Drill* who had "been sent by the contracting officer for the express purpose of giving guidance," reliance on which the court found reasonable, and less like the "vague, abstruse statements and actions" of the technical representatives in *Hughes*, 83–1 BCA at 81,520, reliance on which the Board found unreasonable.

We read the Board's recitation of and remarks on *Hughes* as an implied finding that AEL did not reasonably rely on the government's conduct. In light of *Max Drill* and the Board's express findings of fact, we hold that that implied finding is not supported by substantial evidence.

On the other hand, the Board's express finding that the government expected AEL's continued performance, FF 56, is supported by substantial evidence. *Cf. General Electric Co. v. United States*, 412 F.2d 1215, 1220–21, 188 Ct.Cl. 620 (1969) (under the 1959 LOC clause, CO signing an internal document concurring in a recommendation regarded by the court as an effective decision by the CO that the contractor was entitled to its overrun costs, and not simply loose use of language embodying CO's authority). This Board finding satisfies the second element, that the government intended that its conduct be acted on.

## CONCLUSION

The Board's findings thus demonstrate that all four elements of the estoppel test have been satisfied and render the Board's decision to deny AEL's claim erroneous. Based on the Board's express findings of fact, we hold that the government is estopped from relying on the LOF clause, not in full, but to the extent of the $900,000 which it held out before AEL as an inducement for its continued performance. *See Eyler Associates, Inc.*, 75–1 BCA ¶ 11,320 (ASBCA 1975) (funding part of overrun does not operate to bind government to fund balance of overrun).

Because the Board's determination is incorrect as a matter of law, we reverse the Board's determination and remand this case with instructions to enter judgment for AEL in the amount of $900,000 less any portion thereof which has previously been paid to AEL, plus interest as provided by law.

REVERSED AND REMANDED