824 F.2d 980
 Unpublished disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
VARO, INC., Appellant,
v.
The UNITED STATES, Appellee.
 Appeal No. 86-1032.
 United States Court of Appeals, Federal Circuit.
 June 16, 1987.
 
 Before BISSELL, Circuit Judge, BALDWIN, Senior Circuit Judge, and ARCHER, Circuit Judge.
 ARCHER, Circuit Judge.
 
 DECISION
 
 1
 Varo, Inc. (Varo) appeals from the decision of the Armed Services Board of Contract Appeals (ASBCA or board), ASBCA No. 25446, 86-1 BCA (CCH) p 18,531, denying Varo's claim for an equitable adjustment in the price of Contract No. N00104-73-C-A028 to cover increased costs allegedly attributable to defective drawings and specifications which the United States Department of the Navy (Navy) supplied. We affirm.
 
 OPINION
 
 2
 On January 15, 1973, the Navy entered into Contract No. N00104-73-C-A028 with Varo for the manufacture of certain bomb fuzes in accordance with Navy drawings and specifications. Varo subcontracted the production of MK127 switches, component parts of the bomb fuzes, to Hercules, Inc. (Hercules). These switches were also to be manufactured pursuant to the Navy's specifications.
 
 
 3
 A substantial portion of the switches Hercules produced failed to pass performance and/or lot acceptance tests, resulting in increased costs. Varo sought to recover these additional costs by submitting a claim for equitable adjustment to the contracting officer. Following an unfavorable decision by the contracting officer, Varo appealed to the board pursuant to the Contract Disputes Act of 1978, Pub.L. 95-563, 41 U.S.C. Sec. 601 (1982). In a decision dated October 31, 1985, the board denied Varo's claim, concluding that the Navy's rejection of fuze switch lots was the result, not of defective drawings and specifications, but of "poor workmanship, negligent assembly, and failure to follow the specifications furnished by the government."
 
 
 4
 As the board correctly noted, Varo had the burden of "prov[ing] by a preponderance of the evidence that the plans and specs were in fact defective; that the rejected switch lots were produced in accordance with such defective plans and specs; and that it suffered damages as a direct and proximate result thereof." The board concluded, and we agree, that Varo failed to meet this burden.
 
 
 5
 Varo cites problems experienced by other manufacturers as support for its contention that the drawings and specifications in its contract were defective. The board found, however, that another company, Colt Industries (Colt), successfully manufactured the MK127 switches to the same exact government specifications when Hercules failed to supply switch installments pursuant to its subcontract with Varo; that all of these switches passed government performance test requirements, and that Colt never complained to Varo of any difficulty in adhering to the Navy's specifications in Varo's contract. Although Varo contends that Colt did, in fact, experience problems with switches failing Navy performance tests, the record discloses that the problems cited by Varo and experienced by Colt occurred in earlier contracts and/or in different contracts with manufacturers other than Varo. We are, therefore, unpersuaded of clear error in the board's finding that Colt was able to manufacture switches to the identical requirements imposed upon Hercules and that it did so without complaint of production problems.
 
 
 6
 The board additionally found that Hercules consistently deviated from Navy specifications regarding materials, manufacturing procedures, and workmanship standards without Varo's or the Navy's knowledge or consent. It stated that Hercules utilized defective and salvaged materials as well as inferior components in the production of the switches. It also noted that Hercules did not practice complete inspection of parts on a regular basis, relying instead upon inadequate visual screening. Finally, it found that Hercules deviated from contract manufacturing procedures by improperly mixing "potting material," knowingly utilizing its own range of ignition composition materials, and occasionally allowing the humidity in work areas to exceed acceptable levels. Not only did these practices fail to comply with Navy specifications, but the board also concluded that they were associated with switch defects that caused entire production lots of switches to fail government performance tests and, thus, were a contributing factor in the problems Varo and Hercules encountered during production of the bomb fuzes and component MK127 switches. For example, the board found that defective posts purchased by Hercules contributed to a performance problem known as "push-through;" that inadequate humidity control and hard-packing of the base charge by Hercules resulted in failure of many switches to pass electrical resistivity tests; and that poor soldering techniques used by Hercules resulted in switch failures due to broken bridge wires.
 
 
 7
 Varo attempts to persuade us of error in the board's findings by asserting that Hercules generally complied with industry standards in examining incoming materials to identify nonconformities and that, contrary to the board's findings, it experienced only extremely limited problems with defective and inferior parts. Varo argues that Hercules' occasional lapses were not indicative of on-going employment of improper production techniques and that quality control safeguards protected against such lapses on a recurrent basis.
 
 
 8
 A review of the record leads us to conclude that even though there may have been some evidence in the record to support Varo's arguments, there was also substantial evidence to support the board's findings. Varo essentially asks us to reweigh the evidence and arrive at a different conclusion from that reached by the board. Our scope of appellate review is limited, however, and we can reverse the board's decision only if it is found to be arbitrary, capricious, unsupported by substantial evidence, or rendered in bad faith. 41 U.S.C. Sec. 609(b) (1982); American Electronic Laboratories, Inc. v. United States, 774 F.2d 1110, 1112 (Fed.Cir.1985); Erickson Air Crane Co. of Washington, Inc. v. United States, 731 F.2d 810, 814 (Fed.Cir.1984).
 
 
 9
 Concluding that factual or legal error has not been shown, we affirm the decision of the board.