EBASCO SERVICES, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–355C.

United States Court of Federal Claims.

Feb. 19, 1997.

Julian F. Hoffar, McLean, VA, for plaintiff. Kathleen A. Olden and James M. Donahue, of counsel.

Stephanie M. Jackson, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Assistant Director, Washington, D.C., for defendant. David C. Rickard, Defense Special Weapons Agency, of counsel.

*OPINION*

ANDEWELT, Judge.

### I.

In this government contract action, which is before the court for decision after trial, plaintiff, Ebasco Services, Inc. (Ebasco), seeks to recover approximately $3.4 million for unreimbursed costs it incurred under a cost-plus-fixed-fee contract it entered with the Defense Nuclear Agency of the Department of Defense (the DNA). The contract covered the conceptual design of an electricity storage system for the possible use in connection with a laser-based weapon system. As finally modified, the contract called for a ceiling payment to plaintiff of approximately $15.9 million. Plaintiff allegedly incurred total costs in excess of $19.3 million and seeks to recover the approximate $3.4 million difference.

The contract incorporates by reference a limitation of funds (LOF) clause which provides in part:

   (c) The Contractor shall notify the Contracting Officer in writing whenever it has

reason to believe that the costs it expects to incur under this contract in the next 60 days, when added to all costs previously incurred, will exceed 75 percent of (1) the total amount so far allotted to the contract by the Government....

(d) Sixty days before the end of the period specified in the Schedule, the Contractor shall notify the Contracting Officer in writing of the estimated amount of additional funds, if any, required to continue timely performance under the contract or for any further period specified in the Schedule or otherwise agreed upon, and when the funds will be required.

  \*  \*  \*  \*  \*  \*

(f) Except as required by other provisions of this contract, specifically citing and stated to be an exception to this clause—

(1) The Government is not obligated to reimburse the Contractor for costs incurred in excess of the total amount allotted by the Government to this contract; and

(2) The Contractor is not obligated to continue performance under this contract (including actions under the Termination clause of this contract) or otherwise incur costs in excess of (i) the amount then allotted to the contract by the Government ... until the Contracting Officer notifies the Contractor in writing that the amount allotted by the Government has been increased and specifies an increased amount, which shall then constitute the total amount allotted by the Government to this contract.

  \*  \*  \*  \*  \*  \*

(j) Change orders shall not be considered an authorization to exceed the amount allotted by the Government specified in the Schedule, unless they contain a statement increasing the amount allotted.

48 C.F.R. ch. 1 § 52.232–22.

Because the contract as modified allotted only $15.9 million to the contract, plaintiff is not entitled to any payment above that amount unless it can demonstrate that it is not bound by the limitation in subsection (f)(1) of the LOF clause that "[t]he Government is not obligated to reimburse the Contractor for costs incurred in excess of the total amount allotted by the Government to this contract...." Plaintiff presents three alternative theories for avoiding this limitation: (1) the government waived its rights under the LOF clause; (2) the government should be precluded from relying on the LOF clause based on the doctrine of equitable estoppel; and (3) the government breached its implied duty of good faith and fair dealing.

## II.

Before considering plaintiff's theories for recovery, it is appropriate to recount certain background facts concerning the terms of the contract and performance thereunder. The contract, which the parties entered on November 20, 1987, covered the first phase of a possible two-phase contracting process. The primary objective of this first phase, identified the Superconducting Magnetic Energy Storage–Engineering Test Model Development Program–Phase I (Phase I), was to demonstrate the feasibility of using a Superconducting Magnetic Energy Storage System (SMES system) as an electrical power source. The SMES system was intended to store electrical energy in such a way that the energy could be utilized on instantaneous notice. If successfully developed, the SMES system could be used as a power source for a military ground-based laser system as well as for certain commercial applications, such as for storing excess energy produced by electronic power plants when usage is low and then discharging the energy during periods of high output.

Phase I focused on three major tasks: (1) the completion of a conceptual design of an Engineering Test Model (ETM) of the SMES system; (2) the development of a list of the critical materials and components necessary for construction of the ETM; and (3) the proposal of candidate sites for construction of the ETM. Phase I also called for a final report containing a proposal for continuing the program through Phase II. Phase I did not require plaintiff to perform any particular tests but rather required plaintiff to develop its own design for an ETM and submit

to the DNA a component development and test plan (CDTP). The CDTP was to identify the materials required for construction of the ETM and to demonstrate how those materials and components would be used.

The DNA awarded a similar Phase I contract to Bechtel Power Group (Bechtel). The DNA intended to award a Phase II contract for the detailed design, construction, and testing the ETM to one of the two Phase I contractors. The Phase I contract listed the criteria for the award of a Phase II contract in order of descending importance. Among the most important factors were the demonstration of minimum risk in proceeding with the construction of the ETM, the successful completion of the Phase I tasks, and the submission of reasonable estimated costs for construction of the ETM.

As originally drafted, the contract provided that Ebasco's allowable costs thereunder shall not exceed $13,935,442. The contract, however, did not obligate the DNA to pay the entire contract amount. Rather, the contract anticipated incremental funding and obligated the DNA to pay only the incremental funding specified in the contract. Under the contract, the contracting officer designated a Contract Technical Manager (CTM) to represent the contracting officer in the technical phases of the work and to act as a liaison on funding issues between Ebasco and the Strategic Defense Initiative Office (SDIO), the source of funding for the Phase I contracts. In addition, due in part to the complexity, size, and importance of the Phase I project, the DNA established a Technical Advisory Group (TAG) to advise the CTM as to Ebasco's performance under the contract. The TAG, which was made up of experts in the different areas relevant to the design and construction of the ETM, met periodically throughout performance of the contract with Ebasco and its subcontractors and DNA representatives to discuss the status of the project. After these meetings, the TAG issued nonbinding recommendations to Ebasco regarding Ebasco's analyses, design, and testing efforts.

Contract funding became an important issue between the parties on a number of occasions. In October 1988, almost one year into performance, the DNA became aware that SDIO would not receive the funding it had anticipated for fiscal year 1989 and therefore that the DNA would not be able to provide the incremental funding required for the Phase I contracts. Thereafter, the CTM advised Ebasco of a $2 million shortage of funds for fiscal year 1989 and indicated that the DNA would make up this funding in fiscal year 1990. In January 1989, the contracting officer formally notified Ebasco that its Phase I contract would be extended from November 20, 1989, to May 20, 1990, due to the $2 million shortage in incremental funds for fiscal year 1989.

As a result of this funding delay, together with changes to the CDTP, new tasks recommended by the TAG, and the DNA's delay in selecting a proposed site for ETM construction, Ebasco concluded that in order to complete the contract work, it would need additional funds beyond the contract ceiling. In December 1988, Ebasco representatives met with the CTM to explore the availability of government funds to support the projected increase in costs. The CTM initially advised Ebasco that during fiscal year 1990 there likely would be an increase of $1.5 million in the anticipated ceiling amount in the contract. Ebasco in turn provided this information to its subcontractors and ordered them to reassess the priority of various tests under the CDTP.

On February 22, 1989, Ebasco submitted to the DNA what it characterized as an "Unsolicited proposal" for additional funding in the amount of $3,377,475 above the ceiling amount in the contract. The CTM advised Ebasco that during fiscal year 1990 the DNA would increase the contract ceiling but the increase would be limited to $2 million, which was $500,000 above the $1.5 million the CTM previously had anticipated. The DNA limited the increase to $2 million as a result of budgetary constraints, the DNA's stated position to keep the two Phase I contracts equally funded, and the DNA's decision to eliminate certain test items it no longer considered essential for Phase I completion. With regard to the elimination of test items, the CTM recommended the elimination of certain tests and reductions in the scope of

work required in excess of $900,000. Ebasco advised its subcontractors of the DNA's position and warned that because the additional funding would not be available until fiscal year 1990, the subcontractors conceivably would not get paid until November 1989 (*i.e.*, the beginning of fiscal year 1990) for costs incurred during fiscal year 1989.

Throughout 1989, Ebasco submitted to the contracting officer monthly progress reports which provided updates concerning contract funding issues. The May progress report notified the contracting officer that at the beginning of the May 1989 accounting month, expenditures had reached 75 percent of the total amount the DNA was obligated to pay through fiscal year 1989; the June progress report explained that at the beginning of the July 1989 accounting month, expenditures will have reached approximately 94 percent of the obligated funds for 1989; and the August report indicated that at the end of the August 1989 accounting month, expenditures had reached 100 percent of the obligated funds for 1989.

The parties met on September 27, 1989, to discuss contract funding issues and during that meeting the contracting officer advised Ebasco that Congress had not yet authorized funding for fiscal year 1990 and in addition, that the DNA did not know when the $2 million change order increasing the ceiling amount of the contract would be negotiated. In an October 2, 1989, letter, consistent with its authority under the LOF clause, Ebasco notified the DNA that Ebasco and its subcontractors would stop work under the contract unless the government agreed to provide additional funding. In response to this warning, on October 6, 1989, a Contract Review Board met to consider the contract funding issues and ultimately determined to increase funding by $500,000, the maximum amount available at that time under a binding congressional continuing resolution covering SDIO's funding. On October 26, 1989, the contracting officer issued change order

P00006 which allocated the additional $500,000 to the contract and stated that negotiations involving definitization of the change order would be completed by October 31. Apparently, this increase not only provided for payments to Ebasco during fiscal year 1989 but also increased the contract ceiling amount. No negotiations on definitization of the change order ever occurred.[1]

In a November 22, 1989, letter, Ebasco indicated that it had expended the additional $500,000 allotted to the contract and that it intended to stop work unless the DNA allocated additional funds. In response, the DNA issued change orders P00007 and P00008 which added to the contract $495,000 and $2,065,442, respectively, in incremental funds. These contract modifications did not increase the ceiling amount of the contract, but rather only resulted in incremental funds being available earlier than otherwise could have occurred.

On January 2, 1990, Ebasco notified the DNA that it had stopped work on the contract but later that same day, upon receiving change order P00008, Ebasco resumed work. On January 29, 1990, the DNA issued change order P00009 which allotted to the contract $500,000 in incremental funds and brought the total amount that the DNA obligated itself to pay to $13,935,442, the original contract ceiling amount. On February 2, 1990, the DNA issued change order P00010 which incorporated the $500,000 added by change order P00006 and added an additional $1,499,846 to the total contract amount, raising both the incremental amount the DNA was obligated to pay and the contract ceiling to a total of $15,935,288. This approximate $2 million increase in total contract price was consistent with the CTM's response to Ebasco's February 22, 1989, proposal in which the CTM advised that the total contract price would be increased by $2 million in fiscal year 1990.

---

1. On November 21, 1989, the DNA forwarded to Ebasco a memorandum prepared by the CTM which recommended changes and deletions in proposed testing which would lower Ebasco's costs. Although plaintiff claims that this memorandum constitutes an official contract direction,

the memorandum appears on its face to offer nothing more than recommendations. In response to this memorandum, Ebasco explained that with one exception, all of the work elements recommended for deletion had been completed or were near completion.

On February 28, 1990, Ebasco notified the DNA that it had incurred costs in excess of 75 percent of this new contract ceiling. As of that date, the only work remaining under the contract was the completion of the final report and the execution of the "proof-of-principal experiment," which was in the final process of assembly. The purpose of the proof-of-principle experiment was to identify possible technical problems with the ETM design at the component and subsystem level. From February until May 1990, Ebasco submitted numerous change order requests seeking additional funding and equitable adjustments, and continued to solicit further negotiations with the contracting officer.

On March 22, 1990, in response to Ebasco's March 9 request, Ebasco representatives met with a new CTM and the DNA Assistant Contracts Officer. Ebasco reiterated its concerns relating to increased costs and indicated that by March 31, 1990, it will have expended all or almost all of the allocated funds. The CTM advised Ebasco that no funding was available, that he would request a meeting in early April with the DNA executive leadership to discuss Ebasco's concerns, and that he would "arm wrestle" within the government for additional funding.[2] Following the meeting, Ebasco determined to continue working on the project and advised its subcontractors to do the same. Ebasco encouraged its subcontractors to "proceed on an 'at-risk' basis to complete Phase I work on an accelerated basis."

In a March 23, 1990, letter, in response to Ebasco's representation at the previous day's meeting that Ebasco may incur costs in excess of the contract price, the contracting officer informed Ebasco that "[t]he [DNA] will not reimburse [Ebasco] for funds exceeding $15,935,288.00, the total amount of the contract," and requested Ebasco to "advise [the DNA] as soon as possible on the impact this letter has on the program." In an April 3, 1990, letter, Ebasco requested that the DNA reconsider its position and evaluate each of Ebasco's requests for increased contract funding on its individual merit. The CTM later told Ebasco that its funding con-

cerns could still be addressed at a DNA executive meeting. In an April 5, 1990, letter, the contracting officer informed Ebasco that the meeting would be held on April 12, 1990, and that "[t]he review should include programmatics, funding as to cost to complete Phase I, Phase I objectives to be accomplished, and how [Ebasco] plan[s] to meet these objectives within the current budget." The DNA conducted a similar general program review meeting with Bechtel.

At the April 12 meeting, Ebasco updated the CTM, the Assistant Contracts Officer, and other DNA officials on its progress under the contract and indicated that it intended to finish the Phase I work and to submit a final report. As to Ebasco's requests for equitable adjustments, a DNA official, Colonel Yelmgren, indicated that the DNA "[has] to take a look at the claims" and that "the Government has a responsibility to assure that contractors are treated fairly." DNA officials apparently were pleased that Ebasco would not stop work and intended to complete the project.

On May 14, 1990, the contracting officer issued an initial draft of bilateral modification, P00012, and instructed Ebasco to sign and return the modification if Ebasco accepted its terms and conditions. The modification called for Ebasco to tailor its cost estimates for the Phase II proposal to one specific site, expanded the contract data requirements list, altered the criteria for the Phase II contract, changed Phase II to a cost-plus-fixed-fee contract, and listed specific technical areas in which risk assessment should be performed. Some of these specific technical areas to be included in the technical report previously were rejected as change orders by the contracting officer and recommended for elimination by the CTM. As to additional funding, the modification stated that "[t]he total amount of this contract remains unchanged."

Ebasco's April 1990 progress report, dated May 21, 1990, notified the DNA that apparently by the beginning of the April 1990 accounting month Ebasco had expended all funding allocated under the contract. In a

---

2. At that meeting, the DNA Assistant Contracts Officer commented on how important Ebasco's contract was to the DNA and noted that it was the DNA's largest contract ever.

May 24, 1990, letter, the contracting officer reiterated that the DNA would not allocate additional funds to the contract. The contracting officer explained: "I must reiterate that the contract is clear that funds will not be provided above those already in the contract. [Ebasco is] not obligated to continue performance or otherwise incur costs in excess of the amount allotted in the contract. Any continuation of performance and costs incurred above the amount allotted in the contract will in no way be borne by the government." Despite this letter, Ebasco proceeded with the work under the contract and submitted two additional requests for funding, one on May 25, the day after the contracting officer sent his letter, and the other on May 29.

On June 19, 1990, the contracting officer sent Ebasco a revised version of modification P00012 which the parties later executed. In addition to the changes incorporated in the earlier draft, the revised version extended the submission of the Phase II proposal by 30 days. The letter accompanying the revised modification contained the following statement: "There will be no direct charges made against this Contract after the submission of the Phase II Proposal except for costs incurred in preparing the Final Report and those associated with the Phase I Program Review to be conducted at a date to be determined."

In July 1990, in accordance with the contract, the contracting officer scheduled a program review meeting at which both Ebasco and Bechtel were to make an oral presentation of the Phase I work. Ebasco submitted its final report on July 20, the proof-of-principle experiment occurred on August 7, and the program review meeting took place on August 9.

After reviewing Ebasco's Phase II proposal, in an October 4, 1990, letter, the contracting officer identified 13 issues which required further clarification and directed Ebasco to submit its response by October 11. Ebasco complied with the DNA's request. On June 7, 1991, the DNA notified Ebasco that although Ebasco successfully had completed the Phase I project in July 1990 and provided the DNA with valuable insights into the SMES system design, funding reductions had forced the DNA to cancel its plans for awarding a contract for the Phase II construction. Thereafter, on August 20, 1991, Ebasco submitted a certified claim to the contracting officer for $3,491,704.16, which Ebasco later adjusted to $3,416,051.32. This claim is the subject of the instant suit.

III.

The contract unambiguously states in the LOF clause that "[t]he Government is not obligated to reimburse the Contractor for costs incurred in excess of the total amount allotted by the Government to this contract." Plaintiff's claim covers costs that plaintiff incurred in excess of the "total amount allotted ... to the contract." Hence, to prevail, plaintiff must demonstrate that the LOF clause does not control.

Plaintiff's first argument is that the DNA waived its rights under the LOF clause. *Black's Law Dictionary* 1580 (6th ed. 1990), defines waiver and distinguishes waiver from estoppel as follows:

Terms "estoppel" and "waiver" are not synonymous; "waiver" means the voluntary, intentional relinquishment of a known right, and "estoppel" rests upon the principle that, where anyone has done an act, or made a statement, which would be a fraud on his part to controvert or impair, because other party has acted upon it in belief that what was done or said was true, conscience and honest dealing require that he not be permitted to repudiate his act or gainsay his statement.

Neither the contracting officer nor any other DNA employee ever stated that the government relinquished or intended to relinquish its right under the LOF clause to limit the government's potential liability to the total amount allotted in the contract. Without such direct evidence, plaintiff asks this court to infer that the government intended to waive this right based on the actions of certain DNA representatives. Plaintiff contends that the court should infer such a waiver because DNA representatives (1) induced Ebasco to continue performance after Ebasco had reached the contract limit, (2) directed Ebasco to continue performance af-

ter Ebasco had reached the contract limit, and (3) retained Ebasco's final report.

## IV.

■ Plaintiff cites *Breed Corp. v. United States*, 223 Ct.Cl. 702, 650 F.2d 286 (1980), *Salisbury & Dietz, Inc.*, 87–3 BCA ¶ 20,107 (1987), and *Wind Ship Development Corp.*, 83–1 BCA ¶ 16,135 (1982), for the proposition that a waiver of the LOF clause can be inferred when the government agency induces continued contract performance through actions that create in the contractor a reasonable belief that the agency will increase the amount allotted to the contract. Plaintiff then argues that as a result of certain actions of the contracting officer and other DNA representatives, plaintiff formed a reasonable belief that the DNA would increase the contract amount. Assuming for purposes of argument that the court were to adopt the standard plaintiff proposes, plaintiff still could not prevail because the trial record does not render reasonable Ebasco's belief that the DNA would increase the contract amount.

### A.

Plaintiff focuses in significant part on its March 22, 1990, meeting with the CTM and the DNA Assistant Contracts Officer.[3] Plaintiff argues that at that meeting, DNA representatives induced Ebasco into believing that the DNA would increase the amount allotted to the contract when, after being informed that by the end of that month Ebasco will have reached the contract ceiling, the DNA proceeded to add tasks to the Phase I contract. The additional tasks involved Ebasco's cost pricing proposal for the award of the Phase II contract. But during that meeting, the CTM specifically told Ebasco that no additional funding was available. The CTM advised Ebasco that he would "arm wrestle" within the government for additional funds, but an "arm wrestle" implies a contest with an uncertain result and Ebasco reasonably could not have interpreted such a statement as a commitment by the

DNA to fund beyond the contract limit. Moreover, any misunderstanding as to the DNA's intent with respect to additional funding should have been extremely short-lived because the very next day the contracting officer unequivocally stated in his March 23 letter to Ebasco that the DNA would "not reimburse [Ebasco] for funds exceeding $15,935,288.00, the total amount of the contract."

Plaintiff discounts the significance of this March 23 letter because the CTM later told Ebasco that Ebasco could address its funding concerns at a DNA executive meeting which the contracting officer scheduled shortly thereafter. But the scheduling of a meeting to discuss funding issues is in no way an assurance that the meeting will result in a decision by the DNA to waive the LOF clause or allot additional funds to the contract. The contracting officer's April 5, 1990, letter scheduling the executive meeting for April 12, 1990, did not suggest that the DNA had determined to reverse its prior position and reimburse Ebasco for costs incurred above the contract allotment. Rather, the letter informed Ebasco that, with the Phase I contract coming to an end, the DNA would like to review the status of the project. In addition to addressing funding needed to complete the project, the meeting would cover Ebasco's plan on how to complete the project within the allocated contract price. In this context, the scheduled meeting provided nothing more than a forum for Ebasco to raise its concerns. The contracting officer did not offer any assurances as to how the DNA would address these concerns.

Next, plaintiff focuses on the contracting officer's actions with respect to modification P00012. Plaintiff alleges that the contracting officer was aware that Ebasco had reached the contract limit and hence, by requiring Ebasco in modification P00012 to perform tasks that had not yet been performed, the contracting officer necessarily understood that the contract ceiling would be lifted. But the contracting officer rendered any such interpretation unreasonable by unequivocally stating in modification P00012,

---

**3.** Plaintiff also relies upon certain actions that occurred prior to the March 22 meeting. The court concludes, however, that those actions do

not add significantly to plaintiff's argument and do not render reasonable Ebasco's belief that the DNA intended to increase the contract allotment.

which was bilateral and signed by Ebasco, that "[t]he total amount of this contract remains unchanged."[4] Moreover, the contracting officer's May 24, 1990, letter to Ebasco reiterated that the DNA would not allocate additional funds to the contract.

## B.

Plaintiff also relies upon certain actions of DNA representatives other than the contracting officer. Most significantly, plaintiff relies upon Colonel Yelmgren's representations during the April 12, 1990, meeting that the DNA would "take a look" at Ebasco's claims and that "the Government has a responsibility to assure that contractors are treated fairly." Plaintiff interprets these statements as an indication that the DNA would fund expenditures necessary to complete the Phase I contract. This interpretation, however, fails for a series of reasons.

First, these statements do not reasonably suggest that the DNA intended to fund Ebasco's overrun costs. A promise to "take a look" is nothing more than a commitment to consider Ebasco's claims at some future time. A general commitment to treat Ebasco "fairly" is not sufficiently focused or definite for Ebasco reasonably to conclude that the DNA had made a determination to waive its rights under the LOF clause or committed itself to fund the contract above the existing allotment. Indeed, a decision to increase the funding of the contract necessarily would affect other DNA or SDIO expenditures in that additional payments to Ebasco would leave less money available for other projects. A statement that Ebasco would be treated fairly does not suggest that the DNA or SDIO had gone through the cost-benefit

analysis required to determine whether its limited funds should be spent on Ebasco's contract or rather on other projects that also were directed toward accomplishing the DNA's mission.

Next, to the extent that Ebasco was inclined to interpret these statements as overruling the contracting officer's prior statements, Ebasco reasonably should have obtained clarification of the DNA's position. The LOF clause, in effect, gave Ebasco the tool to achieve such desired certainty. Once Ebasco reached the contract ceiling, the LOF clause authorized Ebasco to stop work under the contract and not to recommence work until the contracting officer notified Ebasco in writing that the DNA had increased the contract allotment by a specified amount. Ebasco successfully utilized this provision previously to obtain additional funding. Thus, instead of relying upon its own conclusion that the DNA intended to raise the contract limit at some future time, Ebasco reasonably should have secured clarification of any ambiguity as to the DNA's position by threatening to stop work.

■ Next, as a matter of contract interpretation, these statements cannot be the basis for a waiver of the LOF clause because the contracting officer is the individual authorized under the contract to issue modifications to the contract and the contracting officer repeatedly and unambiguously stated that the DNA would not reimburse costs above the amount allotted to the contract. On this point, *General Electric Co. v. United States*, 188 Ct.Cl. 620, 412 F.2d 1215 (1969), which plaintiff cites to support its argument,

---

4. Plaintiff points to the following statement in the contracting officer's June 19, 1990, letter which accompanied the revised version of modification P00012:

> c. There will be no direct charges made against this Contract after the submission of the Phase II Proposal except for costs incurred in preparing the Final Report and those associated with the Phase I Program Review to be conducted at a date to be determined.

Plaintiff argues that this language specifically allows for the expenditure of additional funds. But when placed in the appropriate factual context, this statement reasonably can be interpreted only as an instruction as to which expenditures

potentially could be allocated to the Phase I contract, not as an intent to allot funds to the Phase I contract above the amount specified in the contract. The first draft of modification P00012 stated that after submission of the Phase II proposals, only costs associated with the Phase I program review could be expended. The above-quoted statement from the contracting officer's letter clarifies that costs associated with the preparation of the Phase I final report also are included within the Phase I contract. In any event, any possible ambiguity was addressed in the statement in modification P00012 that "[t]he total amount of this contract remains unchanged."

demands such a focus on the actions of the contracting officer when assessing whether a waiver has occurred. *General Electric* involved the application of a limitation of costs (LOC) clause which is analogous to the LOF clause herein. The LOC clause in *General Electric* provides:

> (b) The Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the estimated cost set forth in the Schedule, and the Contractor shall not be obligated to continue performance under the contract or to incur costs in excess of the estimated cost set forth in the Schedule, unless and until the Contracting Officer shall have notified the Contractor in writing that such estimated cost has been increased and shall have specified in such notice a revised estimated cost which shall thereupon constitute the estimated cost of performance of this contract.

*Id.* at 623 n. 1, 412 F.2d at 1217 n. 1. As in the instant case, in *General Electric*, the plaintiff sought to recover funds in excess of the amount allotted to the contract. The *General Electric* court concluded that the plaintiff was entitled to recover its overrun costs only to the extent the contracting officer exercised the discretion delegated to him by agreeing to a specific larger allotment. The court explained this requirement of an affirmative action by the contracting officer as follows:

> No contracting officer has exercised his discretion in favor of a larger amount, and we cannot substitute our judgment for that of the proper decision-maker under the Limitation of Cost clause of the contract. We have no way of knowing whether a contracting officer would have approved the expenses plaintiff allegedly incurred

over the above-stated amount. If the court were to independently redetermine the allowable overrun costs, we would be ignoring the contractual delegation of responsibility by the parties, the same type of encroachment we have condemned in [other] cases.

*Id.* at 630, 412 F.2d at 1222. *Breed, Salisbury,* and *Wind Ship,* upon which plaintiff also relies, are consistent with *General Electric.* In each of these cases, the acts that allegedly induced the contractor into believing that the agency would raise the contract ceiling were acts by the contracting officer.[5]

Applying the LOF clause with a focus on the actions of DNA employees other than the contracting officer not only is inconsistent with the case law and the wording of the contract, but also undermines the desirable certainty that the LOF clause otherwise would bring to relations between the government agency and the contractor. The operation of the LOF clause as interpreted by this court above is straightforward and efficient and generally should produce unambiguous results. Both parties should understand that the government's obligation to reimburse the contractor for costs incurred is limited to the total amount the government allotted to the contract and that only the contracting officer can increase that amount. Both parties further should understand that the contractor can stop work when its costs equal the amount the government allotted to the contract and that the contractor is not required to recommence work until the contracting officer notifies the contractor in writing that the contract allotment is increased by a specified amount. Given these understandings, the LOF clause should function to induce negotiations between the contractor and the contracting officer as the contractor approaches the contract ceiling. To the extent

---

5. *American Electronic Laboratories, Inc. v. United States,* 774 F.2d 1110 (Fed.Cir.1985), also relied upon by plaintiff, does not provide to the contrary. In *American Electronic,* a meeting was called "to negotiate and finalize the funding issue." *Id.* at 1112. Prior to this meeting, the contracting officer signed an internal document authorizing a contract modification of $900,000. *Id.* The government then tried to claim that representations with respect to funding made at the meeting by a representative of the contracting officer were not binding. The court in

*American Electronic* reasoned that " '[w]hen an official of the contracting agency is not the contracting officer, but has been sent by the contracting officer for the express purpose of giving guidance in connection with the contract, the contractor is justified in relying on his representations.' " *Id.* at 1116 (quoting *Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 625, 427 F.2d 1233, 1243 (1970)). In the instant action, plaintiff did not establish that Yelmgren was at the meeting as a representative of the contracting officer.

such negotiations lead to a continuation of the contract work, any increased amount the government is obligated to pay under the contract can be expected to be in writing and signed by the contracting officer. Indeed, this very scenario occurred twice during the course of the instant contract. In both instances, Ebasco threatened to stop work, the DNA in turn considered Ebasco's funding concerns, and the contracting officer ultimately issued a written contract modification specifying the increased ceiling amount that the DNA was obligated to pay under the contract.

The certainty the parties secure with respect to the applicable contract ceiling when any modifications to that ceiling can be only in writing and signed by the contracting officer would be diminished if the court were to authorize unwritten waivers of the LOF clause. To the extent the court were to conclude that agency employees other than the contracting officer can so waive the LOF clause, the diminution in certainty would be even greater. The government would lose the benefit that it derives from the centralization of authority in that it could no longer be assured that a specified written contract ceiling will apply so long as it monitors and controls the actions of the contracting officer. Contractors also could suffer in that instead of focusing on the straightforward issue of whether or not the contracting officer has issued a written statement increasing the amount allotted to the contract, contractors may tend to focus on the much more ambiguous actions of numerous other agency personnel. This broader focus could result in the contractor interpreting certain agency actions as constituting a waiver and then a court later disagreeing and concluding that no waiver occurred. Indeed, according to plaintiff's theory, that is precisely what happened here. Had plaintiff understood that only the contracting officer could waive the LOF clause, plaintiff would have appreciated that no waiver occurred here.

### V.

To this point, the court in effect has assumed that Ebasco continued work under the contract based on its belief that the DNA would increase the contract ceiling, and the court went on to explain why such a belief would not have been reasonable. In any event, however, upon consideration of all of the evidence submitted at trial, the court concludes that Ebasco did not decide to continue work after the April 12, 1990, meeting because it believed the DNA had decided to increase the contract allotment. To the contrary, as Ebasco had indicated to its subcontractors after its March 22, 1990, meeting with the CTM, Ebasco understood that it was proceeding on an "at risk" basis to complete the Phase I work. Instead, there were other reasons behind Ebasco continuing work after reaching the contract ceiling. First, Ebasco was optimistic that the CTM ultimately would be successful in securing additional funding. Second, Ebasco decided to incur expenses above the contract ceiling because it understood that if an award were made on the potentially lucrative Phase II contract, the award would be based in significant part upon a comparison of Ebasco's and Bechtel's work under their respective Phase I contracts. Hence, Ebasco viewed completing the contract work and preparing a quality final report as necessary for Ebasco to prevail against Bechtel in any Phase II contract competition.

In addition to these reasons, Ebasco's Phase I project director testified that Ebasco continued work under the contract because of a sense of professionalism, a desire to maintain its reputation for quality work, and a sense of patriotism resulting from the importance of the contract work from a national security perspective. These purposes are indeed salutary and are worthy of praise. But the crucial point is that Ebasco did not base its determination not to exercise its power under the LOF clause and stop work on a perceived commitment by the DNA to raise the contract allotment. Rather, Ebasco made a voluntary and calculated decision to assume the risk that costs incurred above the contract allotment may not be paid.

### VI.

Plaintiff argues alternatively that the court should infer a waiver of the LOF clause because the DNA directed Ebasco to contin-

ue performance under the contract knowing that Ebasco had reached the contract ceiling. But Ebasco was well aware that under the LOF clause the DNA could not obligate Ebasco to perform any contract tasks once Ebasco had reached the contract ceiling. Moreover, rather than ever suggesting that Ebasco was obligated to continue work, the contracting officer explained in his May 24, 1990, letter that Ebasco had the option to stop work. As described above, Ebasco's determination to continue work under the contract was voluntary in nature, was not coerced by the DNA, and was not based upon a reasonable belief that the DNA had determined to raise the contract price.

### VII.

■ Next, plaintiff argues that the court should infer a waiver of the LOF clause because the DNA accepted Ebasco's final report which included information that Ebasco had accumulated after it had reached the contract ceiling. But, as generally described above, Ebasco is a sophisticated contractor and was well aware of the risks of its actions. The contract contained a ceiling and the court will not read into the contract a term that negates that ceiling simply to protect Ebasco from the risk it knowingly accepted.

Plaintiff cites *North American Rockwell Corp.*, 72–1 BCA ¶ 9,207 (1971), and *Flight Dynamics Research Corp.*, 88–3 BCA ¶ 20,-861 (1988), to support its argument. But even assuming this court adopted the logic therein, plaintiff would not prevail. In *North American*, at 42,722, the Board found compensation appropriate where the government has "demanded and received separate or separable items or units produced *entirely* at costs incurred by the contractor after the contract funds were exhausted" (emphasis added). In *Flight Dynamics*, at 105,500, the Board found that the LOC clause was waived only with respect to data generated solely with overrun funds and included in the final report. Herein, plaintiff has not demonstrated that all of the work included in Ebasco's final report was funded solely with overrun funds. In such a setting, the court cannot force the government to reimburse the contractor "for costs of nonseverable increments

to such property which the contractor added voluntarily with full knowledge that it was in a cost overrun situation." *North American*, at 42,722.

### VIII.

■ Plaintiff's second theory for avoiding the LOF clause is based on the doctrine of equitable estoppel. In *American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110, 1113 (Fed.Cir.1985), the court analyzed the doctrine of equitable estoppel as applied to an LOF clause as follows:

> Four elements must be presented to establish an estoppel: (1) the party to be estopped must know the facts, *i.e.*, the government must know of the overrun; (2) the government must intend that the conduct alleged to have induced continued performance will be acted on, or the contractor must have a right to believe the conduct in question was intended to induce continued performance; (3) the contractor must not be aware of the true facts, *i.e.*, that no implied funding of the overrun was intended; and (4) the contractor must rely on the government's conduct to its detriment.

Plaintiff has failed to meet its burden with respect to the second, third, and fourth elements. With respect to the second element, plaintiff has failed to demonstrate either that the DNA engaged in conduct with the intent of inducing continued performance or that Ebasco had the right to believe that the DNA's conduct was intended to induce continued performance. As to the DNA's intent, as described above, the contracting officer consistently took the position that the DNA intended to enforce the contract ceiling. Indeed, in his May 24, 1990, letter, the contracting officer not only apprised Ebasco of the lack of funds to allot to the contract, but also stressed that Ebasco was not "obligated to continue performance or otherwise incur costs in excess of the amount allotted in the contract." With respect to the intent of DNA representatives other than the contracting officer, plaintiff did not establish at trial that Colonel Yelmgren or any other DNA representative took actions or made statements based on an intent to induce

Ebasco to continue performance.[6] As to Ebasco's "right to believe" that the DNA intended to induce continued performance, in view of the consistent statements of the contracting officer concerning funding and the contracting officer's statement that Ebasco could stop work, Ebasco did not have the right to so conclude.

As to the third element of *American Electronic,* as described above, Ebasco was aware of the pertinent true fact that the contracting officer, as representative of the DNA, had taken the position that the DNA "will not reimburse [Ebasco] for funds exceeding $15,935,288.00, the total amount of the contract." As to the fourth element of *American Electronic,* plaintiff cannot show reliance to its detriment. As generally discussed above, Ebasco's decision to continue performance rather than stop work was not the result of any improper inducement by the DNA but rather was a voluntary decision based primarily on the hope that the DNA would decide to increase funding of the Phase I contract and/or issue Ebasco a Phase II contract. Ebasco understood the risk of continuing performance after it had reached the contract ceiling and Ebasco voluntarily accepted that risk. Ebasco was aware of the relevant facts and was not induced by any actions of the DNA to continue work under the contract.

## IX.

▇ Plaintiff's third theory for avoiding the LOF clause is that the DNA breached the instant contract by acting unfairly and in bad faith. Every government contract contains an implied covenant of good faith and fair dealing. *Solar Turbines, Inc. v. United States,* 23 Cl.Ct. 142, 156 (1991). Where a contractor incurs costs above the contract ceiling as a result of a breach of this covenant, contractual provisions such as the LOF clause are not necessarily controlling and the contractor potentially can recover those expenditures above the contract price that resulted from the government's bad faith or unfair conduct. *Id.* at 156 n. 8.

6. Colonel Yelmgren did not testify at trial.

▇ "Any analysis of a question of Governmental bad faith must begin with the presumption that public officials act 'conscientiously in the discharge of their duties.'" *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 198, 543 F.2d 1298, 1301 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977) (quoting *Librach v. United States,* 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959)). Plaintiff has not overcome this presumption. To the contrary, although the contracting officer was not always prompt in responding to Ebasco's requests, the contracting officer informed Ebasco as to his position on additional funding on March 23, 1990, before Ebasco had exceeded the contract limit, and the contracting officer consistently maintained his position that the contract ceiling was controlling. Plaintiff has not presented any convincing evidence that any DNA representative intended to harm, mislead, conspire against, or take advantage of Ebasco in any way or that any DNA representative's actions had such an effect. The DNA generally acted reasonably and Ebasco understood the risks inherent with incurring expenses in excess of the contract ceiling. The DNA did not act unfairly or in bad faith when it held Ebasco to a clause in the contract to which Ebasco had voluntarily agreed to be bound.

### *Conclusion*

For the reasons set forth above, the court concludes that the DNA did not waive its rights under the LOF clause and, hence, the limitation contained therein controls. Plaintiff is not entitled to be reimbursed for any costs it incurred above the $15,935,288 ceiling specified in the contract. Accordingly, the court denies plaintiff's claim for $3,416,051.32. The Clerk of the Court shall enter judgment dismissing plaintiff's complaint. No costs.

IT IS SO ORDERED.