**NORTHROP GRUMMAN CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–276C.

United States Court of Federal Claims.

Sept. 24, 1998.

William W. Thompson, Jr., Alexandria, VA, for plaintiff. Jeffery B. Krashin and Martin Healy, of counsel.

Steven E. Gordon, Washington, DC, with whom was Assistant Director Bryant G. Snee, and Assistant Attorney General Frank W. Hunger, for defendant. Laurie Baird Hurley, Office of Counsel, Marine Base System Command, Quantico, VA, of counsel.

### *OPINION*

MILLER, Judge.

This government contract action, filed pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1994 & Supp. II 1996) (the "CDA"), is before the court after argument. The issues to be decided are 1) whether Count Six represents a claim for equitable estoppel or a claim for promissory estoppel; 2) whether the Government is estopped from claiming that these clauses preclude an equitable adjustment; 3) whether the contract required advance notice of overruns in excess of the funding levels and funding allotted to the contract and, if so, whether the Government received such notice; and 4) whether absent notices thereunder, the Limitation of Government Obligation and Funding Profile clauses preclude claims for equitable adjustment and breach of contract and thus defeat Counts Two through Five and Seven and Eight.

### FACTS

Sufficient facts in this disputatious litigation enable resolution of some issues on sum-

mary judgment. Fixed-priced incentive contract, No. N00039–89–C–0134, was awarded on December 14, 1988, to Grumman Data Systems, now part of Northrop Grumman Corporation ("plaintiff") by the Department of Navy, Space and Naval Warfare System Command (the "Government"), for plaintiff to develop and produce for the United States Marine Corps the Advanced Tactical Air Command Central ("ATACC") prototype, a computerized communication system, as well as to provide technical data, engineering, and training courses for the ATACC systems. The contract included numerous contract line items ("CLINs") funded on a fixed-price incentive, firm fixed-price, or cost-plus-fixed-fee basis. The work that is the subject of plaintiff's suit was performed and funded on a fixed-price incentive basis under CLINs 0001–0006 and 0010–0012[1] between April 1989 and May 1994. The ATACC prototype—CLIN 0001—represented the vast majority of the contract in terms of effort and funding. The remaining CLINs, 0013–0014 and 0015–0048, represented engineering studies and options for additional units, respectively. The term "contract" in this opinion refers to the fixed-price incentive CLINs.

Plaintiff characterizes the scope of work under the contract as a research and development effort, which was not awarded appropriately under a fixed-price incentive contract. *See* Plf's Proposed Finding No. 41, filed May 6, 1998. Defendant takes the position that the contract was primarily a Non–Development Item ("NDI") contract, with some software development effort, so that a fixed-award was proper. *See* Def's Response to Plf's Proposed Finding No. 41, filed June 19, 1998.

Plaintiff's Best and Final Offer was $23,-267,207.00, which became the total target price and ceiling price for the contract, until modifications increased the amount to $25,894,405.00. Section H of the contract provided that CLINs 0001–0012 would be incrementally funded; the funding profile

delineated the dates by which funding would be allotted, beginning upon contract award in December 1988 and ending Fiscal Year 1994.

On roughly a monthly basis, the contract required plaintiff to submit a Cost Schedule Status Report ("CSSR"), which documented the financial status of the ATACC program by delineating budgeted costs versus actual costs, associated variances, cumulative costs to date, and the latest revised estimate ("LRE") for the final cost of the project at contract completion. The CSSRs were directed to the Government's Program Manager, with a copy to the contracting office. The data contained in the CSSRs would, if scrutinized, indicate a projected overrun and its amount. As early as the May 1989 CSSR, the LRE projected a total contract overrun. The November 1990 CSSR showed a total contract overrun of $9,199,000.00 over the budget base. The largest projected overrun of $13,592,000.00 was reflected in the CSSR for September 1992.

During a May 1989 Systems Requirement Review meeting, the parties determined that plaintiff's workstation architecture of two separate work stations should be improved. The parties dispute whether the original specifications were defective. Pursuant to the Changes clause, and Federal Acquisition Regulation ("FAR") § 52.243–2,48 C.F.R. § 52.243–2 (1997) (as modified by Alternate I (Apr. 1984)),[2] the Government subsequently issued Engineering Change Proposal No. 1 ("ECP–1") to revise the primary specifications for the workstation. The parties entered into a bilateral modification of the contract ("Modification P00011"), effective September 18, 1989, at a price not to exceed $2,000,000.00. Prior to this modification, Jerry A. Glinka, plaintiff's Business Manager for the ATACC program, distributed a May 2, 1988 internal memorandum directing that changes should not be made absent a change in the contract. This memorandum explicitly indicated that "it is not in the best

---

1. CLINs 0002, 0004, 0005, 0006, and 0012 were not priced separately because the costs were subsumed within CLINs 0001, 0003, and/or 0011. CLINs 0007–0009 were terminated for convenience of the Government and settled.

2. All references to the FAR are to the provisions incorporated by the parties into this contract. Although the FAR has since been amended, the provisions referenced herein do not differ materially from those incorporated by the parties.

interest of [Northrop Grumman Corporation] to deliver any item, specification, [or] document ... that is not required by either the [Statement of Work] or the [System Specification] unless formal contractual documents are prepared, priced, accepted by the Government and a contract modification is received." However, the ECP–1 changes allegedly "affected and increased the costs of all phases of the ATACC development including hardware and software." Declaration of Jerry A. Glinka, May 4, 1998, ¶ 31. Defendant contends that, because plaintiff did not segregate the costs, the extent to which the funding overruns were due to ECP–1 was unclear. Nevertheless, in a Marine Corps Systems Command Business Clearance Memorandum dated June 30, 1992, Contracting Officer Cheryl A. DiMaio opined: "There is no doubt from the status reports provided and verified by DCAA that the contractor is in an overrun position on this contract. To date, that overrun is approximately $14M. It stands to reason a fair amount of this overrun could be attributed to the massive design changes imposed by ECP # 1."

In August 1995 plaintiff submitted a claim under the CDA for an equitable adjustment in the amount of $14,162,409.00 for work performed under CLINs 0001, 0003, and 0011.[3] Plaintiff contends that it was encouraged to exceed the funding limit—even after notice of the overrun was given to the Government—and continued performance despite, *inter alia,* constructive changes,[4] extra work, inadequate and defective specifications, lack of governmental cooperation, and interference with performance. From August 1995 to December 1996, plaintiff, Contracting

Officer DiMaio, and, later, Contracting Officer Mark R. Crawford engaged in frequent and often contentious correspondence regarding whether plaintiff could pursue a claim for both reformation of an illegal contract and constructive changes and, if so, whether plaintiff was required to submit a breakdown of costs for the latter. Because Ms. DiMaio declined to issue a final decision within 60 days, the CDA claims were deemed denied, *see* 41 U.S.C. § 605(c), and plaintiff filed its action on April 11, 1997. The complaint comprises eight counts: 1) breach of contract/extra work; 2) breach of contract/delays and acceleration; 3) breach of contract/duty to cooperate; 4) breach of contract/superior knowledge; 5) breach of contract/cardinal change; 6) estoppel/waiver; 7) illegal contract pursuant to section 8118 of the Department of Defense Appropriations Act for the Fiscal Year 1988, Pub.L. No. 100–202, 101 Stat. 1329 (1987); and 8) mutual mistake. On April 8, 1998, defendant filed a motion to dismiss with respect to Count Six and for summary judgment on the remaining seven counts.

### 1. *Contract provisions*

Several provisions potentially affect plaintiff's claims for an equitable adjustment and breach of contract. Even if plaintiff's allegations are correct, defendant maintains, the funding limits in two provisions of the contract limit plaintiff's recovery to the contract award and subsequent modifications and preclude recovery.

The contract specified that allotment of funds would occur through Section H.20—

---

3. Plaintiff set out its claim in a 107–page Request for Equitable Adjustment ("REA") dated July 31, 1995. Defendant alleges that many of plaintiff's claims properly are not before the court because these issues were not presented for the contracting officer's consideration in the REA. Transcript of Proceedings, *Northrop Grumman Corp. v. United States,* No. 97–276C, at 94 (Fed.Cl. Sept. 14, 1998) (hereinafter "Tr."). " 'All that is required [under the CDA] is that the contractor submit in writing a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.' " *Solar Turbines, Inc. v. United States,* 26 Cl.Ct. 1249, 1259 (1992) (quoting *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586,

593 (Fed.Cir.1987)), *aff'd* 114 F.3d 1206 (Fed. Cir.1997). After reviewing plaintiff's REA, the court concludes that ample notice was provided.

4. The constructive changes alleged include: "unreasonably interpreting the specification's [Joint Interoperability of Tactical Command and Control Systems] and [Marine Tactical Systems] message formatting requirements, unreasonably interpreting the specification reliability requirements, constructively changing the specification's mission planning requirements, unreasonably limiting plaintiff's performance, and providing defective specifications." Plf's Proposed Finding No. 43.

Special Contract Requirements—of the contract entitled Limitation of Government's Obligation ("LOGO"), which provides, in part:

b. The Contractor agrees to perform or have performed work on the items up to the point at which, in the event of termination of this contract pursuant to the clause entitled "Termination for Convenience of the Government," the total amount payable by the Government (including amounts payable in respect of subcontracts and settlement costs) pursuant to paragraph (a) of the clause would, in the exercise of reasonable judgment by the Contractor, approximate the total amount at the time allotted to the contract. The Contractor will not be obligated to continue performance of the work beyond that point. The Government will not be obligated in any event to pay or reimburse the Contractor in excess of the amount from time to time allotted to the contract, regardless of anything to the contrary in the clause entitled "Termination for Convenience of the Government."

The LOGO clause also contains a notification provision:

c. ... If funds allotted are considered by the Contractor to be inadequate to cover the work to be performed ... the Contractor will notify the Contracting Officer in writing when, within the next 30 days, the work will reach a point at which ... the total amount payable by the Government (including amounts payable in respect of subcontracts and settlement costs), pursuant to paragraph (e) of the clause, will approximate 85 percent of the total amount then allotted to the contract. The notice will state (i) the estimated date when that point will be reached and (ii) the estimated amount of additional funds required to continue performance.... The Contractor will, 30 days prior to the above written date or agreed substitute date, advise the Contracting Officer in writing as to the estimated amount of additional funds which will be required for the timely performance of the contract for a further period as may be specified in the contract or otherwise agreed to by the parties. If after such letter notification, additional funds are not allotted by the date above

written, or by an agreed substitute date, the Contracting Officer will, upon written request of the Contractor, terminate this contract on that date ... pursuant to the provisions of the clause of this contract entitled "Termination for Convenience of the Government."

Although it did not provide notice in accordance with this provision, plaintiff argues that the contracting officer was aware of the level of funding allotted under the Funding Profile ("FP") clause and that the projected overrun easily could be calculated with information provided in the CSSRs—by subtracting the total contract budget base from the LRE. The contracting officer thus would have been able to ascertain whether the actual cost for work performed exceeded 85% of the total contract amount then allotted. In fact, plaintiff argues, the Government had notice as of January 1991 that plaintiff was projecting a program overrun of $9,199,-000.00, and the record reveals that Contracting Officer DiMaio received an internal e-mail on September 16, 1991, that the CSSRs revealed a funding overrun. The parties strenuously dispute whether these CSSRs could provide adequate actual or constructive notice required by the LOGO clause.

Section H.20(a), the FP clause, applied to CLINs 0001 through 0012 and stated that these CLINs were to be funded incrementally upon a particular funding schedule, beginning with the date of award and ending in Fiscal Year 1994. The FP clause states that funding will occur through the LOGO clause and further provides:

*Notwithstanding any other provision to the contrary,* the Contractor agrees that so long as the Government provides funds in accordance with the funding profile, it will not request additional funds or termination pursuant to paragraph c of the "Limitation of Government Obligation" clause....

b. Notwithstanding any provision to the contrary, the Government's maximum liability is as set forth in the clause entitled, "Limitation of Government Obligation." The Government shall not be obligated to reimburse the Contractor for any costs incurred in excess of the amount

that have [sic] been obligated pursuant to the "Limitation of Government Obligation" clause. . . .

    c. The Contractor acknowledges that it will plan and perform its effort under this contract such that it will not require incremental funding by the Government faster or in greater amounts than set forth in the above funding profile.

(Emphasis added.)

Defendant contends that the LOGO clause expressly limits the Government's obligation to the allotted funding of $25,895,405.00. Plaintiff counters that the LOGO and FP clauses operate only with respect to the original scope of work and "do not limit the Government's obligations under the Changes clause in the Contract." Plf's Br. filed May 5, 1998, at 9.

The Changes clause that applied to the fixed-price CLINs guarantees the contractor an "equitable adjustment" in the "total final price." Section I, cl. (k) of the contract states:

    Equitable adjustment under other clauses. If an equitable adjustment in the contract price is made under any other clause of this contract before the total final price is established, the adjustment shall be made in the total target cost and may be made in the maximum dollar limit on the total final price, the total target profit, or both. If the adjustment is made after the total final price is established, only the total final price shall be adjusted.

The contract also incorporates a number of FAR provisions by reference. First, FAR § 52.243–1,48 C.F.R. § 52.243–1 (1997) (as modified by Alternate II (Apr.1984)), addresses changes to the contract and equitable adjustments. This clause, applicable to the fixed-price incentive CLINs, provides that the contracting officer may at any time make changes to the general scope of the contract by written order. If the changes result in an increase (or decrease) in the cost of performance of any part of the work, and the contractor asserts its right to an adjustment within 30 days of the order, the contracting officer is directed to make an equitable adjustment in the contract price. FAR § 52.243–1(a)-(c). Defendant argues that the

Changes clause does retain its meaning vis-a-vis the LOGO and FP clauses and that plaintiff would have recourse for an equitable adjustment or breach had it followed the written notification procedures set forth in the LOGO notification provision, section H.20(c), *i.e.*, had it given the contracting officer written notice of "when, within the next 30 days, the work will reach of point at which, in the event of termination [for convenience] . . ., the total amount payable . . . will approximate 85% of the total amount then allotted to the contract."

The Limitation of Funds ("LOF") clause, FAR § 52.232–22, also was incorporated by reference into the contract. This clause, however, "appl[ies] to all cost reimbursement CLINs," none of which is at issue here because the CLINs at issue were all fixed-price incrementally funded. Plaintiff distinguishes the LOF clause from the LOGO clause in that

    [t]he LOF clause *explicitly* provides that a contractor must provide notice of a potential funding overrun of changed work as well as base scope work. . . . The LOF clause also *explicitly* sets forth the precise form and content of the contractor's notice. The LOGO clause in this Contract imposes no such requirements. The Boards and Courts have consistently held that, unless the Changes clause is explicitly brought within the reach of funding clauses, claims for changes and extra work are not subject to the requirements of funding clauses.

Plf's Br. filed May 5, 1998, at 4.

According to plaintiff, the regulations do not allow the Government to impose LOF clauses on fixed-price incrementally funded contracts, so that the LOGO and FP clauses confined plaintiff's obligations to provide notice to the original scope of work. Thus, the Changes clause would operate with respect to work beyond or in addition to the scope of the fixed-price contract. Indeed, plaintiff argues that the FP. clause *"prohibited* [plaintiff] from providing notice of cost overruns or seeking additional funding as long as the Government provided full incremental funding." *Id.* at 5. "[E]xcept for the rights and obligations then existing under this clause"

(Contract § H.20(g)), the clause would become "inoperative" upon the allotment of the total price for performance. *Id.* at 6; *see infra* note 10.

For its part, defendant takes the position that the case law interpreting LOF and Limitation of Costs ("LOC") clauses is equally applicable to a LOGO clause "because it is a cost limitation clause and regardless of whether it's a cost-type contract, or a fixed-price type contract, the plain language of the contract remains the same [in that] ... the agreement [to limit the Government's obligation] remains the same." Transcript of Proceedings, *Northrop Grumman Corp. v. United States,* No. 97–276C, at 9 (Fed.Cl. Sept. 14, 1998) (hereinafter "Tr."). Defendant reasons that, in the context of a fixed-price contract, the required notice provisions of the LOGO and FP clauses are the means of alerting the contracting officer to funding overruns that are attributable to claims for work beyond the base scope, given that notice of base scope overruns would serve no other purpose because plaintiff was obligated to perform whatever the cost.

## DISCUSSION

### 1. *Summary judgment*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c). However, summary judgment is inappropriate if there are disputes over material facts that might significantly affect the outcome. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Octocom Sys. Inc. v. Houston Computer Serv. Inc.,* 918 F.2d 937, 940 (Fed.Cir.1990) (defining issue as genuine if it would be reasonable to find in favor of opposing party). Defendant, as the moving party, bears the burden of establishing the absence of any disputes over material facts. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once this burden has been met, the non-moving party must provide sufficient evidence, not necessarily admissible at trial, demonstrating the existence of genuine issues of material fact in order to withstand the motion. *See Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 836 (Fed.Cir.1984); *see also Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988). Evidence may be presented in the form of affidavits from knowledgeable persons. *See Celotex,* 477 U.S. at 323–25, 106 S.Ct. 2548; *Barmag Barmer,* 731 F.2d at 836. However, mere assertions or conclusory allegations are insufficient. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (asserting that affidavits must set forth specific facts); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116 (Fed. Cir.1985) (noting that non-movant must demonstrate an evidentiary conflict by more than conclusory statements or mere denials); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 164 (Fed.Cir.1985) (same). When resolving a motion for summary judgment, the court may not weigh the evidence and seek to determine the truth of the matter. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The court cannot make credibility determinations, *see Jay v. Secretary of DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505), and the non-movant is entitled to "all applicable presumptions, inferences, and intendments...." *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir. 1984).

### 2. *Equitable estoppel*

The gravamen of defendant's motion for summary judgment concerns the interpretation and operation of two contractual provisions—the FP and LOGO clauses—that allegedly limit the Government's funding obligations and thus preclude plaintiff's claim for breach of contract and equitable adjustment. However, Count Six of plaintiff's complaint pleads estoppel to bar defendant from raising these two clauses in its defense. Defendant's motion to dismiss charges that the Count Six claim for estoppel is, in fact, a claim for promissory estoppel which the court lacks jurisdiction to

consider. As a threshold issue, the court must examine the nature of Count Six. If the court rules that it is a claim for equitable estoppel, plaintiff will be required to prove at trial that it meets the four-part test for estoppel set forth by the Federal Circuit in *American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110, 1113 (Fed.Cir.1985). *See Advanced Materials, Inc. v. Perry*, 108 F.3d 307, 311–12 (Fed.Cir.1997). If plaintiff were successful on its estoppel claim, defendant would be barred from raising the LOGO or FP clauses as a defense, thus obviating the need to interpret either clause.

Count Six states, in relevant part:

49. The Government, by its actions and inactions, induced [plaintiff] to perform work and incur costs beyond the scope of work under the Contract.

50. The Government knew or should have known that [plaintiff] performed work and incurred costs beyond the scope of work under the Contract.

51. The Government is estopped from denying that it is liable to [plaintiff] for damages and/or for an equitable adjustment in Contract price under the Changes clause for all costs incurred by [plaintiff] in performing work beyond the scope of work under the Contract.

Compl. filed Apr. 11, 1997, ¶¶ 49–51.

In *Radioptics, Inc. v. United States*, 223 Ct.Cl. 594, 624, 621 F.2d 1113, 1129 (1980), the United States Court of Claims expressed "some reservation" as to whether a claim based upon promissory estoppel is within this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994 & Supp. II 1996). Thereafter, decisions at the trial level have ruled that the United States " *'has not waived its sovereign immunity with regard to a promissory estoppel cause of action.'* " *Biagioli v. United States*, 2 Cl.Ct. 304, 308 (1983) (emphasis added) (quoting *Jablon v. United States*, 657 F.2d 1064, 1070 (9th Cir.1981)); *see also R.R.*

*Donnelley & Sons, Co. v. United States*, 38 Fed.Cl. 518, 521 (1997); *Gregory v. United States*, 37 Fed.Cl. 388, 396 (1997); *Knaub v. United States*, 22 Cl.Ct. 268, 276 (1991). Distinguishing between promissory estoppel and equitable estoppel thus is crucial. Courts have often employed the sword and shield dichotomy: Whereas promissory estoppel is used offensively, to create a cause of action, equitable estoppel functions defensively " 'to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is entitled to institute.' " *Biagioli*, 2 Cl.Ct. at 307 (quoting *Jablon*, 657 F.2d at 1068); *see Knaub*, 22 Cl.Ct. at 276.

Not discouraged by the fact that the Federal Circuit applied equitable estoppel to preclude the Government from raising the LOF clause as a total bar to an action for excess costs, defendant urges this court to address the jurisdictional issue that was not raised by the Government in *American Electronic Laboratories*, and that the appeals court therefore passed on *sub silentio*. Defendant presumes too much. This court will not undertake a gratuitous jurisdictional inquiry in the face of binding precedent that assumes jurisdiction unless some plausible reason exists for doing so. However, the case law defining an equitable estoppel claim is compatible with the applicable statute conferring jurisdiction to hear it.[5]

Equitable estoppel forecloses the Government from denying the existence of a contractual liability, but cannot fabricate a contract that would not otherwise exist. *See Llamera v. United States*, 15 Cl.Ct. 593, 600 (1988). Plaintiff asserts no promise by the Government that substitutes for consideration. Rather, plaintiff contends correctly that Count Six attempts to prevent the Government from denying liability under either the Changes clause of the contract or in response to a claim for breach of an implied-in-fact contract for the additional work al-

5. Even if the court were to agree with defendant, it still would be obliged to apply Federal Circuit precedent and offer its views for consideration should an appeal be lodged in this or a similar case. Because this question is a collateral inqui-

ry that the court should only undertake in the event that a significant jurisdictional argument has been proffered, the court has concluded defendant should have left this argument *silentio*.

leged. As such, Count Six sounds in equitable estoppel.

█ The Federal Circuit has articulated a four-part test to establish an equitable estoppel claim under similar circumstances:

(1) [T]he party to be estopped must know the facts, *i.e.*, the government must know of the overrun; (2) the government must intend that the conduct alleged to have induced continued performance will be acted on, or the contractor must have a right to believe the conduct in question was intended to induce continued performance; (3) the contractor must not be aware of the true facts, *i.e.*, that no implied funding of the overrun was intended; and (4) the contractor must rely on the government's conduct to its detriment.

*American Electronic Labs.*, 774 F.2d at 1113; *see also Advanced Materials*, 108 F.3d at 311–312 (employing same test); *Peters v. United States*, 28 Fed.Cl. 162, 168–170 (1993) (same).

█ Although defendant cites evidence that calls into question whether plaintiff will meet its burden at trial, defendant, as the moving party, bears the burden of demonstrating the absence of evidence raising genuine issues of material fact with respect to these required factors. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Avia Group*, 853 F.2d at 1560. Defendant challenges expressly plaintiff's ability to prove the second, third and fourth requisite elements. Defendant cites an absence of evidence of inducement, and the court agrees. The court therefore singles out the second prong of the equitable estoppel inquiry—inducement of performance by the contracting officer—because plaintiff's failure to make the required showing is fatal.

In support of plaintiff's estoppel theory, Mr. Glinka declares:

28. While the Government knew that the Contract was in an overrun position, there was no evidence that the Government did not want the prototype CLINs performed.

. . . .

35. Northrop Grumman, with the Government's encouragement, continued performance and continued to incur costs in excess of the obligation limitation due to the various constructive changes, extra work, defective specifications, delays, acceleration, and interference.

Glinka Decl. ¶¶ 28, 35. Plaintiff also cites documents showing that the Government was aware, not only of the nature and extent of the work plaintiff performed, but also of funding overruns. In spite of this knowledge, plaintiff alleges that the Government directed and caused it to take additional actions, which plaintiff followed, resulting in additional work. Plaintiff emphasizes that the Government at no time discouraged it from performing or indicated that it no longer wanted the CLINs performed. Moreover, plaintiff contends that the extra work, which constituted constructive changes, was authorized by the Program Manager.

None of plaintiff's evidence, however, suggests that it could prove inducement, as the case law has given meaning to the concept. *See. e.g., Advanced Materials*, 108 F.3d at 312 (finding that statements regarding potential willingness to fund overrun insufficient to constitute inducement or as basis for detrimental reliance); *Ebasco Servs., Inc. v. United States*, 37 Fed.Cl. 370, 381–82 (1997) (holding that contractor's decision to continue performance was voluntary and not induced by actions or statements of representatives, particularly in light of contracting officer's consistent indications that funding limit would be enforced). In the case at bar, plaintiff made no showing that the Government intended to create an objective expectation of an intent to provide further funding. *Cf. American Electronic Labs.*, 774 F.2d at 1115 (holding that Government "consistently induced [plaintiff] to continue its performance by making representations that [it] would fund the overrun"). Mr. Glinka's declaration is dispositive because it offers nothing more than mere assertions and conclusory statements regarding alleged inducement, which renders it insufficient to raise a genuine issue of material fact. *See Matsushita Elec.*, 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *Barmag Barmer*, 731 F.2d at 836. Because defendant has shown an absence of evidence on at least one element of equitable estoppel

for which plaintiff bears the burden of proof, the court grants defendant's motion for summary judgment on Count Six. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.[6]

■ Count Six also pleads an implied waiver by the contracting officer. Plaintiff advances several contentions to support its waiver argument. First, plaintiff argues that the contracting officer waived the notice requirements of the LOGO clause by inducing plaintiff to incur costs that exceeded the funding limitations, despite having actual notice of likely overruns since as early as May 1989. Plaintiff also asserts that the contracting officer manifested her intent to waive the LOGO clause funding limitation by failing to make mention of the LOGO clause in communications prior to the filing of defendant's motion. Plaintiff has presented no evidence, however, that indicates that the contracting officer voluntarily and intentionally relinquished a known right. *See Ebasco Servs.,* 37 Fed.Cl. at 376. Nor did the contracting officer manifest any intent to waive the funding limitation in writing. To the contrary, in a January 31, 1991 letter to plaintiff, Contracting Officer DiMaio noted that "the ceiling price [of the contract as modified] was clearly stated." The contracting officer neither explicitly nor implicitly waived the funding limitations of the LOGO clause. Defendant is entitled to a grant of summary judgment on plaintiff's waiver claim.

Finally, plaintiff construes Count Six as pleading an implied-in-fact contract. By its terms it does not. Plaintiff has not amended its complaint, nor do its various arguments and proposed findings raise a genuine issue of material fact regarding its ability to satisfy the four-part test of *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir. 1997), and *City of El Centro v. United States,* 922 F.2d 816, 820 ( Fed.Cir.1990), to establish a contract implied in fact. In opposing defendant's motion, it was incumbent upon plaintiff to submit evidence establishing both that necessary elements for such a claim

were present and that the work for which recovery is claimed was not covered by an express contract. *See Trauma Serv. Group,* 104 F.3d at 1326 (stating that implied-in-fact contract by definition cannot exist if express contract encompasses the subject matter at issue).

■ The elements of an implied-in-fact contract are 1) mutual intent to contract, 2) unambiguous offer and acceptance, 3) consideration, and 4) authority of the government representative to contract. *See Trauma Serv. Group,* 104 F.3d at 1326; *City of El Centro,* 922 F.2d at 820. Even though plaintiff has alleged that the work in question falls outside the express parameters of the original contract, plaintiff wholly has failed to show that these elements have been satisfied. Plaintiff's contentions focus primarily upon the Government's alleged inducement of constructive changes, which may suffice under certain circumstances. *See Sperry Corp. v. United States,* 13 Cl.Ct. 453, 458 (1987) ("Although inducement is not an element of a contract implied in fact, inducement and encouragement to do work may constitute implied acceptance."); *see also Pacific Maritime Ass'n v. United States,* 123 Ct.Cl. 667, 675–76, 108 F.Supp. 603, 606–07 (1952). The court previously has determined that no evidence of inducement has been put forth, which renders plaintiff's showing deficient. Because plaintiff's evidence is merely colorable and falls short of establishing the required elements, *see Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Electric,* 475 U.S. at 586–87, 106 S.Ct. 1348; *Avia Group,* 853 F.2d at 1560, summary judgment in defendant's favor is granted insofar as Count Six might be construed to plead an implied-in-fact contract.

### 3. *The LOGO clause notice requirement*

■ Contract interpretation is a question of law and begins with an examination of the plain language utilized by the parties. *See Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998); *Northrop*

---

6. Defendant only moved to dismiss this count for lack of subject matter jurisdiction, and its argument on the merits responded to contentions in plaintiff's opposition. Plaintiff is not prejudiced

by treating defendant's motion as to Count Six as one for summary judgment, because the parties' cross-proposed findings and evidentiary showings on all counts proceeded under RCFC 56.

*Grumman Corp. v. Goldin,* 136 F.3d 1479, 1483 (Fed.Cir.1998); *Aleman Food Servs. v. United States,* 994 F.2d 819, 822 (Fed.Cir. 1993). Where the contract language is sufficiently clear, the court's inquiry is at an end, because the plain language of the contract controls. *See Textron Defense Sys.,* 143 F.3d at 1469. A contract term is unambiguous when, given the ordinarily accepted meaning of the language, only one reasonable interpretation appears. *See Triax Pac., Inc. v. West,* 130 F.3d 1469, 1473 (Fed.Cir.1998) (asserting that "[w]hen a contract term is unambiguous, [the court] cannot assign it another meaning, no matter how reasonable that other meaning might seem to be."); *Grumman Data Sys., Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir.1996) (defining ambiguity as more than one reasonable interpretation); *A–Transport Northwest Co., Inc. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir.1994) (same).

In its analysis the court may "place itself in the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents." *H.B. Mac, Inc. v. United States,* 153 F.3d 1338, 1345 (Fed.Cir.1998); *ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975) (presuming that parties have level of commercial intelligence and understanding with regard to complexities and consequences of contract). The contract must be considered as a whole and construed "so as 'to effectuate its spirit and purpose' and to give 'reasonable meaning to all of its parts.'" *Northrop Grumman Corp.,* 136 F.3d at 1483 (quoting *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991); *see Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed. Cir.1985); *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). Such construction " 'will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.'" *Gould, Inc.,* 935 F.2d at 1274 (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978)); *W.M. Schlosser Co. v. United States,* 767 F.2d 870, 874 (Fed.Cir.1985) (finding interpretation unreasonable that renders language superflu-

ous); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983) (reading contract to give meaning to all provisions).

1) In support of its claim for changed work under the fixed-price CLINs, plaintiff argues that it had no obligation to give defendant notice of the funding overruns for the fixed price CLINs because the funding notice requirement was "by definition" inapplicable. Plf's Br. filed May 5, 1998, at 6 n. 3. Plaintiff postulates that because the contract was fixed price, the original scope of work establishes the price and the contractor's remedy for costs exceeding this price is found in the Changes clause. Defendant maintains that the FP and LOGO clauses, by stating "[n]otwithstanding any provision to the contrary," supersede the Changes clause, thereby conditioning plaintiff's right to bring a claim for an equitable adjustment or breach on giving notice in the manner required by the LOGO clause.

The LOGO clause provides that plaintiff will inform the Government when the contractor reaches 85% of the funding allotted for work under the contract and—per defendant's interpretation—for changes. The contract contemplates notice by the contractor when the funding limitation is about to be reached. Sound policy supports the requirement that a contractor notify the contracting officer of the funding status, particularly if the contractor is aware that it intends make a claim. *See Titan Corp. v. West,* 129 F.3d 1479, 1482 (Fed.Cir.1997) (finding notice necessary to recover overrun costs above ceiling of LOC clause in cost-plus-fixed-fee contract when overrun was foreseeable). Nonetheless, the LOGO notice provision in this contract is limited to the situation in which the Government has failed to allocate funds consistent with the funding profile. Upon receipt of such notice, the Government can choose to continue funding or terminate for convenience upon written request of the contractor. Timely notice permits the contractor to request termination for convenience if the required funding is not forthcoming. After notice, if the contractor continues work in

excess of the funding provided, the contractor would do so at its own risk.[7]

The fundamental differences underlying a fixed-price contract and a cost-reimbursement contract play a key role in resolving the issue of how the LOGO notice provision is to be interpreted. Despite defendant's assertions that the case law dealing with LOF and LOC clauses is equally applicable to the LOGO clause in this case, Tr. at 9, distinct considerations are implicated. *See Advanced Materials*, 108 F.3d at 310 (outlining the purpose of cost limitation provisions); *McDonnell Douglas Corp. v. United States*, 37 Fed.Cl. 295, 303, *modified*, 39 Fed.Cl. 665 (1997) (discussing distinctions between cost-reimbursement contracts and fixed-price contracts). In a cost-reimbursement contract, the Government assumes all of the costs incurred by the contractor during performance, which engenders concerns regarding the Government's ability to control expenditures and limit its liability. LOC and LOF provisions serve to permit the Government an opportunity to increase funding or terminate a project in an overrun status. A fixed-price contract, by contrast, is not subject to the same funding concerns because the contractor must perform without regard to the cost of work within the scope of the contract or under a fixed-price bilateral modification. A critical factor in the analysis of clauses limiting liability is the ability of the contractor to cease performance upon reaching full funding. *See Advanced Materials*, 108 F.3d at 310–11 (holding that limitation on cost is prospective and will not be retroactively applied when contractor may stop work prior to incurring costs above funding limitation); *Ebasco Servs.*, 37 Fed.Cl. at 379–80 (noting purpose for such limitations on liability and concluding that limitation on liability in conjunction with contractor's right to stop work should induce negotiations between parties); *Appeal of Applied Tech. Assocs., Inc.*, 98–1

BCA ¶ 29,633, 1998 WL 122361 (1998) (discussing contractor's right to cease performance in exchange for Government's right to notice as integral factor of cases enforcing LOGO liability limitation). The absence of such a right has been held to preclude the enforcement of LOGO clause notice provisions and to permit the contractor to recover. *See Applied Tech. Assocs.*, 98–1 BCA ¶ 29,-633.

■ 2) Section I of the contract applies numerous FAR provisions to "all fixed price incentive CLINs." The Changes clause to which plaintiff refers is FAR § 52.243–1, Changes—Fixed Price, and allows for an equitable adjustment in the contract price if the contracting officer makes changes within the scope of the contract and issues a written order, and the contractor asserts its right to an adjustment within 30 days of the order. According to defendant, plaintiff can recover only upon demonstrating that it was compelled to continue performance of work pretextually within the confines of the contract or any similar bilaterally executed modification.

It is elementary that plaintiff would not be forced to continue to perform with regard to work falling outside the scope of the contract. On the other hand, because the contract is fixed-price, plaintiff could not cease work simply because it was confronted with a potential funding overrun situation for work within the scope of the contract. The plain language of the FP clause compels this interpretation: "Notwithstanding any other provision to the contrary, the Contractor agrees that so long as the Government provides funds in accordance with the funding profile, it will not request additional funds or termination pursuant to paragraph c of [LOGO] clause." Paragraph c of the LOGO clause allows the contractor to stop work if, after sufficient notice, the Government fails to allot

7. If notice were required, plaintiff argues that satisfactory notice was provided through the CSSRs. Plaintiff submitted evidence demonstrating that the contracting officer had actual notice of the overruns. Although defendant contends that this notice did not conform with the requirements of the LOGO clause, actual notice has been held to be "the substantial equivalent." *See Appeal of Applied Technology Assocs., Inc.*,

98–1 BCA ¶ 29,633, 1998 WL 122361 (1998) (holding that monthly progress payment requests which indicated funding status provided notice required under LOGO clause); *see also American Electronic Labs.*, 774 F.2d at 1113 (noting, although not deciding waiver of notice issue, no dispute that actual notice occurred or that nonconforming notice was sufficient under contractual requirements).

funds as proscribed by the schedule in the FP clause.

The parties have exhausted every conceivable meaning of the language "[n]otwithstanding any other provision to the contrary." Defendant insists that this language embraces the Changes clause, such that plaintiff would be entitled to stop work at any time upon reaching 85% of the funding allotted to the base contract, as well as 85% of the funds allotted in any bilaterally executed fixed-price modification. In doing so, defendant misunderstands the operation of the Changes clause and the manner in which it intersects with FP and LOGO clauses. The presumption that plaintiff could have stopped work with regard to the base scope of the contract or with regard to changes is erroneous precisely because this is a fixed-price contract.[8] The LOGO, FP, and Changes clauses do not contain language permitting plaintiff to cease performance in the face of a funding overrun situation. *See Appeal of Douglas Aircraft Co., Inc.*, 66–2 BCA ¶ 6,049, 1966 WL 528 (1966) (resolving ambiguity in relationship of LOC and LOGO clauses to Changes clause and permitting recovery of termination claim and reasonable fee in cost-plus contract); *compare Titan Corp.*, 129 F.3d at 1481 (providing specifically that funding limits in cost-plus contract encompass Changes clause and permitting contractor to cease performance upon expenditure of allocated funding), *with Appeal of Ryan Aeronautical Co.*, 61–1 BCA ¶ 2,911, 1961 WL 664 (1961) (holding that ceiling cost is not applicable "to a change which increases costs under the contract" if provision is present providing for price revision). Under the contract plaintiff could effect a termination for convenience and thereby stop work only if the Government failed to allocate funds in accordance with the FP clause.

Plaintiff contends that the "[n]otwithstanding" language is sensible if its application is limited to the confines of the funding profile section. Tr. at 47. Such an interpretation defies logic.[9] The import of this language is that, for work identified under the base contract, the Government's liability will be limited to that stated in the LOGO clause. The Government's liability under the base contract is limited to $23,267,207.00. This language underscores defendant's position that, provided that funds are forthcoming in a timely fashion, plaintiff cannot request additional funds or request a termination for convenience. Defendant's interpretation is reinforced by the appearance of an additional LOGO clause in the bilaterally executed modification P00011, which increased the Government's liability by $2,000,000.00.[10]

In the subsequent section, the FP clause reiterates that "[n]otwithstanding any provision to the contrary, the Government's maximum liability is as set forth in the clause entitled, [LOGO]." This language operates in a similar fashion and demonstrates the Government's intent to limit its liability to the Government's funding obligations under the FP clause. It is not superfluous. However, this language does not preclude liability for additional work pursuant to the Changes clause, an equitable adjustment, or a bilateral modification. To the extent that the "[n]otwithstanding" language may create a latent ambiguity in the contract, it should be construed against the Government as drafter. *See Triax Pacific, Inc.*, 130 F.3d at 1474 (noting "[a]mbiguities in a government contract are normally resolved against the drafter" unless patent); *see also Interstate Gen.*

8. Defendant also offers a strained interpretation of that part of the LOGO clause that states: "The Government will not be obligated in any event to pay or reimburse the Contractor in excess of the amount from time to time allotted to the contract, regardless of anything to the contrary in the clause entitled 'Termination for Convenience of the Government.'" Although the Government suggests that this release applies regardless of any clause in the contract, the plain language of the clause belies this construction.

9. Plaintiff further asserts that the LOGO clause prohibited it from requesting increased funding resulting from constructive changes. This limitation merely precludes plaintiff from seeking funding in excess of or more quickly than what is identified in the LOGO and FP clauses.

10. Plaintiff avers incorrectly that the LOGO provision becomes inoperative upon receipt of full funding under the contract. Rather, because this is a fixed-price contract, the LOGO clause remains operative with regard to work under the original scope of the contract or any subsequently executed bilateral modification.

*Gov't Contractors v. Stone*, 980 F.2d 1433, 1434 (Fed.Cir.1992); (asserting that non-drafter's interpretation will prevail if more than one reasonable interpretation); *ITT Arctic Servs., Inc.*, 524 F.2d at 684 (same).

Whether the constructive changes for which plaintiff seeks to recover are within the scope of the contract is an issue because plaintiff inexplicably contends that they are not within the scope of the contract. If these constructive changes fall within the scope of work required under the contract as modified, plaintiff could not cease performance, but must proceed under the Changes clause. Plaintiff also may be entitled to recover for breach if it is able to demonstrate that these changes were the result of breach of good faith and fair dealing or that defendant had superior knowledge.[11] *See generally Fox Valley Eng'g Inc. v. United States*, 151 Ct.Cl. 228 (1960) (holding that plaintiff entitled to recover for changes not incorporated into contract under theory of breach). Conversely, if the purported constructive changes constitute work outside the scope of the contract, plaintiff was not bound to continue performing in the absence of additional modifications. It would be logical for plaintiff, a sophisticated contractor, to identify work external to the scope of the contract. This comports with the purpose of a fixed-price contract, which allocates risk at the time of contracting, irrespective of what hindsight may reveal and identifies with certainty the benefits and burdens borne by the parties.

#### 4. *Illegal contract and mutual mistake*

Count Seven avers that the contract is illegal and unenforceable because the Gov-ernment failed to comply with section 8118 of the Department of Defense Appropriations Act for the Fiscal Year 1988, Pub.L. No. 100–202, 101 Stat. 1329–84 (1987), and thus seeks in *quantum meruit*. On March 9, 1998, the Federal Circuit vacated its reversal of the decision in *AT & T v. United States*, 124 F.3d 1471, 1479–80 (1997) (holding *quantum meruit* unavailable to remedy invalid contract), *reh'g en banc granted*, 136 F.3d 793 (Fed.Cir. 1998), and has not yet set a date for oral argument for a hearing *en banc*. If the ATACC contract is deemed void, the LOGO and FP clauses would be nullified, but would not foreclose *quantum meruit* as a remedy. *See generally United States v. Amdahl Corp.*, 786 F.2d 387, 392–98 (Fed.Cir.1986) (allowing *quantum meruit* as remedy under implied-in-fact contract where original contract subsequently declared invalid). Defendant argues, however, that even if plaintiff ultimately prevails on this Count (or Count Eight), plaintiff "cannot avoid a cost ceiling" and that the "cost ceiling of $25,895,405.00 should survive any potential reformation." Def's Br. filed May 20, 1998, at 27.

Count Eight alleges a mutual mistake of fact and seeks rescission of the contract or reformation of the clauses upon which defendant bases its motion. Mutual mistake is predicated on the claim that "the Marines' actual requirements for the ATACC and/or the nature and extent of the design and development that [plaintiff] would be required to perform under the contract." Compl. ¶ 60. Like Counts Three through Five and Seven, plaintiff argues that the

---

11. Defendant argued that the LOGO and FP limitations on liability would preclude plaintiff from recovery even in the event of breach. Defendant's argument is curious. The court will not interpret these clauses to reach an unjust or impractical result. It is axiomatic that either party would be entitled to some recovery in the event of a breach of the contract. *See Raymond Constructors of Africa, Ltd. v. United States*, 188 Ct.Cl. 147, 166, 411 F.2d 1227, 1237 (1969) (holding limitation clause inapplicable where contractor incurred additional costs as a result of "Government's failure to perform"); *Solar Turbines*, 26 Cl.Ct. at 1276 (finding that plaintiff failed to establish breach of contract and therefore was bound by funding limitation). Defendant's reading of *Solar* is even stranger. Ac-cording to defendant, the trial court would have enforced the funding ceiling to bar recovery absent allegations of bad-faith actions by the Government. Tr. at 12. Plaintiff's allegations in *Solar*, analyzed collectively for purposes of summary judgment, included claims for breach resulting from, *e.g.*, superior knowledge. *See Solar Turbines, Inc. v. United States*, 23 Cl.Ct. 142, 153–57 (1991) (order denying summary judgment). As in *Solar* plaintiff's claims in the instant case are not limited to allegations of bad faith. Defendant should derive the less fickle teaching from *Solar, i.e.,* that the court could not resolve the case on summary judgment, particularly as its motion neglected to address plaintiff's breach claims.

contract's FP and LOGO clauses alone cannot provide a defense or form the basis for judgment for defendant on these counts.

Similarly, as the issue of breach is not ripe for summary judgment disposition, questions of fact are present with regard to plaintiff's allegations of illegality, Count Seven, and mutual mistake, Count Eight, which cannot be resolved at this time.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's *motion for summary judgment* is granted insofar as Count Six pleads a claim for equitable estoppel.

2. Defendant's *motion for summary judgment* is granted insofar as Count Six pleads claims of waiver and implied-in-fact contract, and these claims shall be dismissed.

3. Defendant's *motion for summary judgment* is denied in all other respects.